IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| CONSERVATION COUNCIL FOR HAWAII, CENTER FOR BIOLOGICAL DIVERSITY, and TURTLE ISLAND RESTORATION NETWORK, | ) ) ) ) | CIVIL NO. 14-00528 LEK-RLP |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| NATIONAL MARINE FISHERIES SERVICE, UNITED STATES DEPARTMENT OF COMMERCE, and PENNY PRITZKER, SECRETARY OF COMMERCE, | ) ) ) ) ) | |
| Defendants. | ) ) | |

**ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND FOR VACATUR**

Before the Court is Plaintiffs Conservation Council for Hawaii, Center for Biological Diversity, and Turtle Island Restoration Network's (collectively "Plaintiffs") Motion for Summary Judgment and for Vacatur ("Motion"), filed on July 20, 2015. [Dkt. no. 47.] On August 20, 2015, Intervenor-Defendant Hawaii Longline Association ("HLA") filed its memorandum in opposition ("HLA Opposition"), and Defendants National Marine Fisheries Service ("NMFS"), United States Department of Commerce, and Penny Pritzker, Secretary of Commerce (collectively "Federal Defendants") filed their memorandum in opposition ("Federal

Defendants Opposition").[1]  [Dkt. nos. 50, 52.]  Plaintiffs filed their reply on September 3, 2015.  [Dkt. no. 57.]

This matter came on for hearing on September 25, 2015, and, later that day, this Court issued an entering order directing the parties to file additional memoranda.  [Dkt. no. 64.]  HLA and the Federal Defendants filed their respective memoranda on October 9, 2015.  [Dkt. nos. 66, 68.]  Plaintiffs also filed their memorandum on October 9, 2015.  [Dkt. no. 69.] After careful consideration of the Motion, supporting and opposing memoranda, the arguments of counsel, and the relevant legal authority, Plaintiffs' Motion is HEREBY GRANTED IN PART AND DENIED IN PART.  For the reasons set forth below, this Court GRANTS Plaintiffs' Motion insofar as this Court FINDS that Plaintiffs have standing to pursue this action and CONCLUDES that their claims are justiciable, but this Court DENIES Plaintiffs' Motion in all other respects.

## BACKGROUND

Plaintiffs filed this action on November 20, 2014. Plaintiffs filed their First Amended Complaint for Declaratory and Injunctive Relief ("Amended Complaint") on January 15, 2015. [Dkt. no. 18.]  They bring this case pursuant to, *inter alia*, the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-06, and

---

[1] This Court will refer to the Federal Defendants and HLA collectively as "Defendants."

2

the Magnuson-Stevens Fishery Conservation and Management Act

("Magnuson-Stevens Act"), 16 U.S.C. § 1855(f).  [Id. at ¶ 6.]

This case concerns the limits on fishing and catching of bigeye

tuna in the Western and Central Pacific Ocean ("WCPO").  The

parties agree that it "is an important food fish and is

particularly prized for sushi.  In Hawai`i, it is one of two

species known as `ahi; the other is yellowfin tuna." [Id. at

¶ 39; Federal Defs.' Answer to Amended Complaint ("Federal Defs.'

Answer"), filed 2/2/15 (dkt. no. 21), at ¶ 39.]  The Federal

Defendants acknowledge that, "in 2004, NMFS determined that

overfishing is occurring Pacific-Wide on bigeye tuna, but that

the stock is not overfished."  [Federal Defs.' Answer at ¶ 40.]

> In the instant case,
>
> Plaintiffs seek to set aside (1) NMFS's final rule
> implementing a management framework for specifying
> catch and effort limits and accountability
> measures for pelagic fisheries in the U.S. Pacific
> territories of American Samoa, Guam, and the
> Commonwealth of the Northern Marina Islands;
> (2) NMFS's associated final specifications
> purporting to establish a separate catch limit of
> 2,000 metric tons of long-line caught bigeye tuna
> for each of the three territories; and (3) NMFS's
> authorization for each territory to allocate up to
> 1,000 metric tons of that limit to eligible U.S.
> longline fishing vessels.  See 79 Fed. Reg. 64,097
> (Oct. 28, 2014) . . . .

[Amended Complaint at ¶ 1.]  The contested rule is NMFS, National

Oceanic and Atmospheric Administration ("NOAA"), and Department

of Commerce's Final rule and final specifications regarding

Western Pacific Pelagic Fisheries; U.S. Territorial Catch and

Fishing Efforts Limits.  This Court will refer to it as the "Quota Shifting Rule."[2]

The legal landscape of the instant dispute begins with the international Convention on the Conservation and Management of Highly Migratory Fish Stocks in the Western and Central Pacific Ocean ("Convention").

## I.  **The Convention**

The United States Senate consented to the ratification of the Convention in 2004.[3]  S. Exec. Rep. No. 109-08, at 2, 6. The Senate's report acknowledged that legislation was necessary to implement the Convention.  Id. at 5.  The ratification occurred in 2007, [Amended Complaint at ¶ 29; Federal Defs.' Answer at ¶ 29,] when the United States deposited the instrument of ratification and became a party to the Convention thirty days later.  Pub. L. No. 109-479, 120 Stat. 3575 (Jan. 12, 2007).

_____

[2] Plaintiffs utilize the name "Quota Shifting Rule" in their pleadings and the instant Motion.  See, e.g., Amended Complaint at ¶ 1; Motion at 2.  However, at the hearing on the Motion, they argued that the name is misleading because it incorrectly implies that there is an entitlement to catch a certain amount of bigeye tuna.  Plaintiffs argued that there are no quotas at issue in this case, only catch limits.  This Court notes that one of the definitions of the word "quota" is: "[a]n official **limit** on the number or amount of something that is allowed or required over a given period[.]"  Quota, Black's Law Dictionary (10th ed. 2014) (emphasis added).  For the sake of consistency with the key documents filed in this case, this Court will also use the name "Quota Shifting Rule."

[3] The Convention is also referred to as the "WCPFC Convention" and the "Western and Central Pacific Convention." See, e.g., 16 U.S.C. § 6901(12).

The objective of the Convention is "to ensure, through effective management, the long-term conservation and sustainable use of highly migratory fish stocks in the western and central Pacific Ocean in accordance with" the "United Nations Convention on the Law of the Sea of 10 December 1982" ("1982 Convention") and the "Agreement for the Implementation of the Provisions of the United Nations Convention on the Law of the Sea of 10 December 1982 relating to the Conservation and Management of Straddling Fish Stocks and Highly Migratory Fish Stocks" ("Agreement").  [Henkin Decl., Exh. 4 (Convention) at art. 2 & art. 1, §§ a-b.]

The Convention established the Commission for the Conservation and Management of Highly Migratory Fish Stocks in the Western and Central Pacific Ocean ("Commission" or "WCPFC"). [Id. at art. 1, § c & art. 9 (Establishment of the Commission).] As a "Contracting Party" to the Convention, the United States is a member of the Commission.  [Id. at art. 34, §§ 1, 4.]  American Samoa, Guam, and the Northern Mariana Island ("CNMI") are among the territories that are allowed to participate in the Commission ("Participating Territories" or "PTs").  [Id. at art. 43.]  The Convention's area of application, *i.e.* "the area of competence of the Commission" ("Convention Area"), is defined in Article 3, section 1.

The Convention requires members of the Commission to, *inter alia*: "adopt measures to ensure long-term sustainability of highly migratory fish stocks in the Convention Area and promote the objective of their optimum utilization"; [id. at art. 5, § a;] and "promptly implement the provisions of this Convention and any conservation, management and other measures or matters which my be agreed pursuant to this Convention from time to time and shall operate in furthering the objective of this Convention" [id. at art. 23, § 1].

The Commission's functions include, *inter alia*:

> (a)  determine the total allowable catch or total level of fishing effort within the Convention Area for such highly migratory fish stocks as the Commission may decide and adopt such other conservation and management measures [("CMMs")] and recommendations as may be necessary to ensure the long-term sustainability of such stocks; [and]
>
> . . . .
>
> (c)  adopt, where necessary, conservation and management measures and recommendations for non-target species and species dependent on or associated with the target stocks, with a view to maintaining or restoring populations of such species above levels at which their reproduction may become seriously threatened[.]

[Id. at art. 10, § 1.]  The Department of Commerce has stated that, "[a]s a Contracting Party to the Convention and a Member of the [Commission], the United States is obligated to implement the decisions of the [Commission]."  77 Fed. Reg. 51709, 51710 (Aug. 27, 2012).

6

## II.  **Relevant CMMs**

### A.  **CMM 2005-01**

The Commission's CMM 2005-01 addressed bigeye and yellowfin tuna.  [Pltfs.' Concise Statement of Undisputed Material Facts ("Pltfs.' CSOF"), filed 7/20/15 (dkt. no. 48), Declaration of David L. Henkin ("Henkin Declaration"), Exh. 8 (CMM 2005-01).]  It provides that: "Through the adoption of necessary measures, the total level of fishing effort for bigeye and yellowfin tuna in the Convention Area shall not be increased beyond current levels."  [Id. at ¶ 1 (footnote omitted).]  The United States's bigeye tuna catch limit for the three years after the adoption of CMM 2005-01 was set at its 2004 catch level, [id. at ¶ 17 & n.2,] which was 4,181 metric tons ("mt").  [HLA's Concise Statement in Opposition to Pltfs.' Concise Statement of Material Facts ("HLA CSOF"), filed 8/20/15 (dkt. no. 51), Decl. of Ryan P. Steen ("Steen Decl."), Exh. 3 (CMM 2008-01) at 41 (Attachment F (table of "Baseline Longline Bigeye Tuna Catches, by Flag")).]

### 2.  **CMM 2008-01**

The Commission's CMM 2008-01 recognized that prior CMMs that "were developed to mitigate the overfishing of bigeye and yellowfin tuna and to limit the growth of fishing capacity in the" WCPO "have been unsuccessful in either restricting the apparent growth of fishing capacity or in reducing the fishing

7

mortality of bigeye or juvenile yellowfin tuna." [Id. at 1.] The objectives of CMM 2008-01 include:

>   -Ensure through the implementation of compatible measures for the high seas and [exclusive economic zones ("EEZs")] that bigeye and yellowfin tuna stocks are maintained at levels capable of producing their maximum sustainable yield; . . . [and]
>
>   -Achieve, through the implementation of a package of measures, over a three-year period commencing in 2009, a minimum of 30% reduction in bigeye tuna fishing mortality from the annual average during the period 2001-2004 or 2004[.]

[Id. at ¶ 1.] Thus, "[t]he total catch of bigeye tuna by longline fishing gear [was to] be subject to a phased reduction such that by 1 January 2012 the longline catch of bigeye tuna [would be] 70% of the average annual catch" in 2004 for the United States, China, and Indonesia. [Id. at 7, ¶ 31 & n.3.] However, because the United States's catch in the WCPO was less than 5,000 mt in 2004, it was only required to implement a ten percent reduction in 2009, 2010, and 2011. [Id. at 8, ¶¶ 33, 35 & 41 (Attachment F).] Its limit for each of those years was 3,763 mt, and the limit stayed the same in 2012. See 77 Fed. Reg. 51709, 51711 (Aug. 27, 2012). The limit did not apply to American Samoa, Guam, and the CNMI (collectively, "U.S. PTs") because they were among the "participating territories that caught less than 2,000 tonnes in 2004." [Steen Decl., Exh. 3 (CMM 2008-01) at 8, ¶ 32.] The limits for those PTs in 2009

8

through 2011 were either 2,000 mt or no limit, as long they were "undertaking responsible development of their domestic fisheries." [Id. at 8, ¶¶ 32, 34.]

The United States reached its catch limit before the end of the year in 2009 and 2010, resulting in the closure of the longline fishery in Hawai`i, *i.e.* "NMFS prohibited retention of bigeye tuna in the WCPO." [Steen Decl., Exh. 1 (Amendment 7 Fishery Ecosystem Plan for Pelagic Fisheries of the Western Pacific Region, etc., Including an Environmental Assessment and Regulatory Impact Review, dated 3/27/14 ("Amendment 7 EA")) at 14.]  In 2011, after NMFS forecasted that the limit would be reached in late-November,

under the authority provided in Section 113(a),[4]

————————————

   [4] "Section 113" refers to § 113 of the Consolidated and Further Continuing Appropriations Act, 2012.  Public Law No. 112-55, 125 Stat. 552 (Nov. 18, 2011).  Section 113 was to remain in effect until no later than December 31, 2012.  Section 113(c). Congress later extended Section 113 through December 31, 2013. Consolidated and Further Continuing Appropriations, 2013, Division B, Title I (Department of Commerce), § 110.

   Section 113(a) sates:

         The U.S. Participating Territories of the
         Commission for the Conservation and Management of
         Highly Migratory Fish Stocks in the Western and
         Central Pacific Ocean ("Commission") are each
         authorized to use, assign, allocate, and manage
         catch limits of highly migratory fish stocks, or
         fishing effort limits, agreed to by the Commission
         through arrangement with U.S. vessels with permits
         issued under the Pelagics Fishery Management Plan
         of the Western Pacific Region.  Vessels under such
                                            (continued...)

> the American Samoa government entered into a
> two-year fishing agreement with U.S. vessels in
> the Hawaii Longline Association (HLA), which
> include nearly all vessels operating in the Hawaii
> longline fishery.  Consistent with Section 113(a),
> NMFS attributed 628 mt of bigeye tuna caught by
> HLA vessels under the agreement in 2011 to
> American Samoa.

[Id.]  A similar situation arose in 2012, and NMFS attributed

771 mt of bigeye tuna catch to American Samoa.  In 2013, there

was a similar agreement with the CNMI.  [Id.]  501 mt of bigeye

tuna caught by Hawai`i longline vessels was attributed to the

CNMI.  Quota Shifting Rule, 79 Fed. Reg. at 64099.  This Court

will refer to this type of agreements as "specified fishing

agreements."

-------------------

⁴(...continued)
> arrangements are integral to the domestic
> fisheries of the U.S. Participating Territories
> provided that such arrangements shall impose no
> requirements regarding where such vessels must
> fish or land their catch and shall be funded by
> deposits to the Western Pacific Sustainable
> Fisheries Fund in support of fisheries development
> projects identified in a Territory's Marine
> Conservation Plan and adopted pursuant to section
> 204 of the Magnuson-Stevens Fishery Conservation
> and Management Act (16 U.S.C. 1824).  The
> Secretary of Commerce shall attribute catches made
> by vessels operating under such arrangements to
> the U.S. Participating Territories for the
> purposes of annual reporting to the Commission.

### 3.  __CMM 2013-01__

The Commission's CMM 2013-01[5] again recognized that prior CMMs "have been unsuccessful in either restricting the apparent growth of fishing capacity or in reducing the fishing mortality of bigeye or juvenile yellowfin tuna." [Steen Decl., Exh. 2 (CMM 2013-01) at 1.]  Paragraph 40 of CMM 2013-01 states: "The catch limits in 2014 and thereafter for bigeye tuna shall be as specified in Attachment F.  Any overage of the catch limit by a CCM shall be deducted from the catch limit for the following year for that CCM."[6]  [__Id.__ at 10.]  Attachment F, titled "Bigeye Longline Catch Limits by Flag," sets the following catch limits for the United States: 2014 - 3,763 mt; 2015 - 3,554 mt; 2016 - 3,554 mt; and 2017 - 3,345 mt.  [__Id.__ at 21.]  CMM 2013-01 states: "Paragraph 40 does not apply to members that caught less than 2,000 tonnes in 2004.  Each member that caught less than 2,000 tonnes of bigeye in 2004 shall ensure that their catch does not exceed 2,000 tonnes in each of the next 4 years (2014, 2015, 2016 and 2017)."  [__Id.__ at 10, ¶ 41.]  It states that "opportunities for non-members will be decided by the Commission on a case by

___

[5] The Commission adopted CMM 2013-01 during its Tenth Regular Session, which occurred December 2 to 6, 2013.  [Steen Decl., Exh. 2 (CMM 2013-01) at i.]

[6] "CCM" refers to a Commission member, cooperating non-member, or participating territory.  __See, e.g.__, Henkin Decl., Exh. 8 (CMM 2005-01) at 2.

case basis."  [Id.]  CMM 2013-01 does not address the 2014-2017 bigeye tuna catch limits for PTs.

For purposes of, *inter alia*, paragraph 40, "attribution of catch and effort shall be to the flag State, except that catches and effort of vessels notified as chartered under CMM 2011-05 shall be attributed to the chartering Member or Participating Territories."  [Id. at 3, ¶ 5.]  However, CMM 2013-01 also states: "Unless otherwise stated, nothing in this Measure shall prejudice the rights and obligations of those small island developing State Members and Participating Territories in the Convention Area seeking to develop their domestic fisheries."  [Id. at 4, ¶ 7.]

CMM 2013-01 was later replaced by CMM 2014-01.  [Reply, Suppl. Decl. of David L. Henkin ("Henkin Reply Decl."), Exh. 42 (CMM 2014-01) at 14, ¶ 62.[7]]  CMM 2014-01 has the same catch limits for the United States.  [Id. at 22 (Attachment F).]  The parties' arguments are based on CMM 2013-01, because it was the operative measure when NMFS promulgated the Quota Shifting Rule. However, the Court notes that the relevant provisions of CMM 2014-01 appear to be substantively identical to the relevant provisions of CMM 2013-01.

---

[7] Exhibit 42 is not a complete version of CMM 2014-01.  It is missing pages 15 through 22, which are presumably Attachments A through E.  See Henkin Reply Decl., Exh. 42 at 22 (Attachment F).

III. **Implementation Act**

In 2007, Congress passed the Western and Central Pacific Fisheries Convention Implementation Act ("Implementation Act").  Pub. L. 109-479, Title V, § 501, 120 Stat. 3656.  It is codified at 16 U.S.C. § 6901, *et seq.*  16 U.S.C. § 6904 governs the Secretary of Commerce's ("Secretary") rule-making authority. It states:

> (a) Promulgation of regulations
>
> The Secretary, in consultation with the Secretary of State and, with respect to enforcement measures, the Secretary of the Department in which the Coast Guard is operating, is authorized to promulgate such regulations as may be necessary to carry out the United States international obligations under the WCPFC Convention and this chapter, including recommendations and decisions adopted by the Commission.  In cases where the Secretary has discretion in the implementation of one or more measures adopted by the Commission that would govern fisheries under the authority of a Regional Fishery Management Council, the Secretary may, to the extent practicable within the implementation schedule of the WCPFC Convention and any recommendations and decisions adopted by the Commission, promulgate such regulations in accordance with the procedures established by the Magnuson-Stevens Fishery Conservation and Management Act (16 U.S.C. 1801 et seq.).
>
> (b) Additions to fishery regimes and regulations
>
> The Secretary may promulgate regulations applicable to all vessels and persons subject to the jurisdiction of the United States, including United States flag vessels wherever they may be operating, on such date as the Secretary shall prescribe.

The parties agree that "[t]he authority to promulgate regulations

13

pursuant to the Implementation Act has been delegated to NMFS."

[Amended Complaint at ¶ 34; Federal Defs.' Answer at ¶ 34

(admitting allegations in Plaintiffs' paragraph 34).]

The Enforcement section of the Implementation Act

states, in pertinent part:

> The Secretary shall prevent any person from
> violating this chapter in the same manner, by the
> same means, and with the same jurisdiction,
> powers, and duties as though all applicable terms
> and provisions of the Magnuson-Stevens Fishery
> Conservation and Management Act (16 U.S.C. 1857)
> were incorporated into and made a part of this
> chapter.  Any person that violates any provision
> of this chapter is subject to the penalties and
> entitled to the privileges and immunities provided
> in the Magnuson-Stevens Fishery Conservation and
> Management Act [16 U.S.C.A. 1801 et seq.] in the
> same manner, by the same means, and with the same
> jurisdiction, power, and duties as though all
> applicable terms and provisions of that Act were
> incorporated into and made a part of this chapter.

16 U.S.C. § 6905(c).  Because "all applicable terms and

provisions" of the Magnuson-Stevens Act are effectively

incorporated into the Implementation Act when addressing

violations of the Implementation Act, this Court concludes that

regulations promulgated pursuant to the Implementation Act are

subject to judicial review in the manner described in the

Magnuson-Stevens Act.

## IV.  **Magnuson-Stevens Act**

The Ninth Circuit has stated:

> The Magnuson-Stevens Fishery Conservation and
> Management Act ("Magnuson-Stevens Act"), 16 U.S.C.
> §§ 1801-1884, "was enacted to establish a

14

federal-regional partnership to manage fishery resources." Nat'l Res. Def. Council, Inc. v. Daley, 209 F.3d 747, 749 (D.C. Cir. 2000). Under the Magnuson-Stevens Act, the federal government exercises "sovereign rights and exclusive fishery management authority over all fish, and all Continental Shelf fishery resources, within the exclusive economic zone" ("EEZ"), 16 U.S.C. § 1811(a), which extends from the seaward boundary of each coastal state to 200 miles offshore, id. § 1802(11); City of Charleston v. A Fisherman's Best, Inc., 310 F.3d 155, 160 (4th Cir. 2002). The Magnuson-Stevens Act expressly preserves the jurisdiction of the states over fishery management within their boundaries. See 16 U.S.C. § 1856(a)(1).

To manage fishing in the EEZ, the Magnuson-Stevens Act calls for the creation of regional Fishery Management Councils ("FMCs"), composed of state and federal officials and experts appointed by the Secretary of the National Marine Fisheries Service ("NMFS"). 16 U.S.C. § 1852(b)(1)-(2). With the cooperation of "the States, the fishing industry, consumer and environmental organizations, and other interested persons," id. § 1801(b)(5), the NMFS and FMCs develop and promulgate Fishery Management Plans ("FMPs") to "achieve and maintain, on a continuing basis, the optimum yield from each fishery," id. § 1801(b)(4). In the Magnuson-Stevens Act, "optimum yield" means the amount of fish that "will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems." Id. § 1802(33); see also 50 C.F.R. § 600.310(e)(3).

Chinatown Neighborhood Ass'n v. Harris, 794 F.3d 1136, 1139-40 (9th Cir. 2015) (footnotes omitted). The regional council for Hawai`i, American Samoa, Guam, and the CNMI is the Western Pacific Fishery Management Council ("WESPAC" or "the Council"). 16 U.S.C. § 1852(a)(1)(H).

The FMPs and FMP amendments that the regional councils prepare must be reviewed and approved by NMFS, and must comply with the requirements of 16 U.S.C. § 1853(a) and applicable laws. See 16 U.S.C. § 1854(a)(1)-(3).  In addition, regional councils can propose regulations or modifications to regulations that are necessary to implement an FMP or an FMP amendment.  § 1853(c). Any FMP or regulation implementing an FMP pursuant to the Magnuson-Stevens Act must be consistent with ten "national standards for fishery conservation and management."  16 U.S.C. § 1851(a).

Regulations promulgated pursuant to the Magnuson-Stevens Act are subject to judicial review under certain provisions of the APA.  16 U.S.C. § 1855(f).  Section 1855(f)(1)(B) states that "the appropriate court shall only set aside any such regulation or action on a ground specified in section 706(2)(A), (B), (C), or (D) of" the APA.  5 U.S.C. § 706 is quoted *infra*.

## V.  Quota Shifting Rule

On December 23, 2013, pursuant to Amendment 113, WESPAC transmitted Amendment 7 to the Secretary, who approved it on March 28, 2014, after Amendment 113 had lapsed.  The Quota Shifting Rule, published on October 28, 2014, "implement[s] conservation and management measures described in Amendment 7." 79 Fed. Reg. at 64098.  It authorizes "territories to enter into

specified fishing agreements with U.S. fishing vessels permitted under the FEP [(Fishery Ecosystem Plan)], and to allocate to those vessels a specified portion of the territory's catch or fishing effort limit, as determined by NMFS and" WESPAC.  Id. Further, it notes that:

> NMFS is using the framework process to specify a longline bigeye tuna catch limit of 2,000 mt for each U.S. participating territory.  Additionally, NMFS specifies that **each territory may allocate up to 1,000 mt of that limit to U.S. longline fishing vessels based in other U.S. participating territories or in Hawaii, and identified in a specified fishing agreement**.  NMFS will monitor catches of longline-caught bigeye tuna, including catches made under specified fishing agreements, and restrict catches, as appropriate, using the accountability measures described in this final rule.  The longline bigeye tuna catch limit specifications are effective for the 2014 fishing year, which began on January 1, 2014.

Id. (emphasis added).

The Amended Complaint alleges that the Quota Shifting Rule: violates the Implementation Act and the APA ("Count I"); and violates the Magnuson-Stevens Act and the APA ("Count II"). Plaintiffs seek the following relief: a declaratory judgment concerning the alleged violations; an order vacating and setting aside the Quota Shifting Rule; any appropriate injunctive relief; reasonable attorneys' fees and costs; and any other appropriate relief.

Plaintiffs argue that, because the United States agreed to abide by the catch limits established pursuant to the

17

Convention, the Magnuson-Stevens Act and the Implementation Act require NMFS to implement regulations that enforce the catch limits.  According to Plaintiffs, the Quota Shifting Rule violates the applicable CMMs, and therefore: 1) NMFS exceeded its authority under the Magnuson-Stevens Act and the Implementation Act when it promulgated the Rule; and 2) the rule is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law, within the meaning of the APA.  Plaintiffs therefore argue that this Court should conclude that the Quota Shifting Rule is unlawful and set it aside.

## **STANDARD**

The parties agree that this Court's review of the Quota Shifting Rule is pursuant to the Magnuson-Stevens Act.  When reviewing a regulation promulgated pursuant to the Magnuson-Stevens Act, a district court "shall only set aside any such regulation or action on a ground specified in section 706(2)(A), (B), (C), or (D) of" the APA.  16 U.S.C. § 1855(f)(1)(B).  The APA provides, in relevant part:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.  The reviewing court shall—
>
> . . . .

> (2)  hold unlawful and set aside agency action, findings, and conclusions found to be–

>> (A)  arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

>> (B)  contrary to constitutional right, power, privilege, or immunity;

>> (C)  in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [and]

>> (D)  without observance of procedure required by law[.]

5 U.S.C. § 706.  Thus, the Ninth Circuit has stated:

> In reviewing regulations promulgated under the [Magnuson-Stevens Act], "our only function is to determine whether the Secretary [of Commerce] 'has considered the relevant factors and articulated a rational connection between the Facts found and the choice made.'"  Alliance Against IFQs v. Brown, 84 F.3d 343, 345 (9th Cir. 1996) (quoting Wash. Crab Producers, Inc. v. Mosbacher, 924 F.2d 1438, 1440–41 (9th Cir. 1990)).  "We determine only if the Secretary acted in an arbitrary and capricious manner in promulgating such regulations."  Alliance Against IFQs, 84 F.3d at 345.  "Under the APA, we will reverse the agency action only if the action is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law."  Lands Council v. Powell, 379 F.3d 738, 743 (9th Cir. 2004), amended by 395 F.3d 1019 (9th Cir. 2005).

Fishermen's Finest, Inc. v. Locke, 593 F.3d 886, 894 (9th Cir. 2010) (some alterations in Fishermen's Finest).  "Even when an agency explains its decision with 'less than ideal clarity,'" the Court must uphold the action "if the agency's path may be reasonably discerned."  San Luis & Delta-Mendota Water Auth. v.

<u>Locke</u>, 776 F.3d 971, 994 (9th Cir. 2014) (citation omitted).

This deference is "at its highest where a court is reviewing an

agency action that required a high level of technical expertise."

<u>Id.</u>

## I.   <u>**Arbitrary and Capricious Review**</u>

The Ninth Circuit has stated that:

> "Review under the arbitrary and capricious
> standard is narrow, and we do not substitute our
> judgment for that of the agency."  <u>Ecology Ctr. v.
> Castaneda</u>, 574 F.3d 652, 656 (9th Cir. 2009)
> (alterations omitted) (quoting <u>Lands Council v.
> McNair (Lands Council II)</u>, 537 F.3d 981, 987 (9th
> Cir. 2008) (en banc), *overruled on other grounds
> by* <u>Winter v. Natural Res. Def. Council, Inc.</u>, 555
> U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249
> (2008)) (internal quotation marks omitted).
> "Rather, we will reverse a decision as arbitrary
> and capricious only if the agency relied on
> factors Congress did not intend it to consider,
> entirely failed to consider an important aspect of
> the problem, or offered an explanation that runs
> counter to the evidence before the agency or is so
> implausible that it could not be ascribed to a
> difference in view or the product of agency
> expertise."  <u>Id.</u> (quoting <u>Lands Council II</u>, 537
> F.3d at 987) (internal quotation marks omitted).

<u>Cascadia Wildlands v. Bureau of Indian Affairs</u>, 801 F.3d 1105,

1110 (9th Cir. 2015).  This showing is a "heavy burden."  <u>Managed

Pharmacy Care v. Sebelius</u>, 716 F.3d 1235, 1244 (9th Cir. 2013).

The arbitrary and capricious standard

> requires the [agency] to articulate [] a rational
> connection between the facts found and the choice
> made.  [We] review the record to ensure that
> agency decisions are founded on a reasoned
> evaluation of the relevant factors, and may not
> rubberstamp . . . administrative decisions that
> [are] inconsistent with a statutory mandate or

> that frustrate the congressional policy underlying
> a statute . . . .

Sierra Club v. U.S. E.P.A., 671 F.3d 955, 961 (9th Cir. 2012)

(some alterations in Sierra Club) (citations and quotation marks

omitted).

## II. Exceeds Authority Review

When evaluating a challenge to an agency action

pursuant to § 706(2)(C), courts apply the two-step framework that

the United States Supreme Court set forth in Chevron, U.S.A. Inc.

v. Natural Resources Defense Council, 467 U.S. 837 (1984). See,

e.g., Nw. Envtl. Advocates v. U.S. E.P.A., 537 F.3d 1006, 1014

(9th Cir. 2008). This district court has described the Chevron

framework as follows:

> Under the Chevron framework, the court must
> first "determine whether 'the intent of Congress
> is clear.'" Marmolejo-Campos v. Holder, 558 F.3d
> 903, 908 (9th Cir. 2009) (quoting Chevron, 467
> U.S. at 842, 104 S. Ct. 2778). "[I]f the intent
> of Congress is clear and unambiguously expressed
> by the statutory language at issue," the court's
> analysis ends, Zuni Pub. Sch. Dist. No. 89 v.
> Dep't of Educ., 550 U.S. 81, 93, 127 S. Ct. 1534,
> 167 L. Ed. 2d 449 (2007), and "both the court and
> the agency 'must give effect to the unambiguously
> expressed intent of Congress.'" Marmolejo-Campos,
> 558 F.3d at 908 (quoting Chevron, 467 U.S. at
> 842-43, 104 S. Ct. 2778). If, on the other hand,
> the statute is silent or otherwise ambiguous, the
> court must determine "whether the agency's answer
> is based on a permissible construction of the
> statute." Chevron, 467 U.S. at 843, 104 S. Ct.
> 2778.
>
> . . . .

> In step 2 of the <u>Chevron</u> analysis, the court
> need not find that the agency "interpretation is
> the only permissible construction of [the statute]
> or even the reading [the court] would have
> reached, but only that [the agency's]
> interpretation is not arbitrary and capricious."
> <u>Natural Res. Def. Council v. E.P.A.</u>, 526 F.3d 591,
> 605 (9th Cir. 2008) (citing <u>Chevron</u>, 467 U.S. at
> 843 n.11, 104 S. Ct. 2778).  To determine if the
> construction is permissible, the court must "'look
> to the plain and sensible meaning of the statute,
> the statutory provision in the context of the
> whole statute and case law, and to the legislative
> purpose and intent.'" <u>Id.</u> (quoting <u>Cuevas-Gaspar</u>
> <u>v. Gonzales</u>, 430 F.3d 1013, 1022 (9th Cir. 2005)).

<u>Skyson USA, LLC v. United States</u>, 651 F. Supp. 2d 1202, 1206-07

(D. Hawai`i 2009) (alterations in <u>Skyson</u>).

### **DISCUSSION**

### I.   <u>Standing</u>

At the outset, this Court must address Defendants'

argument that Plaintiffs do not have standing to challenge the

Quota Shifting Rule.  Defendants argue that Plaintiffs have not

demonstrated that they have personally suffered a concrete and

particularized injury that is attributable to the Quota Shifting

Rule; Defendants argue that Plaintiffs cannot establish standing

with allegations of harm to the marine ecosystem in general and

to the nearshore fisheries that their members use and enjoy.

Further, even assuming, *arguendo*, that Plaintiffs' alleged

ecosystem harm is a legally cognizable injury, Defendants argue

that this Court should still find that Plaintiffs lack standing

because the alleged injuries are conjectural and hypothetical, not actual or imminent.

Plaintiffs have "the burden of proving the existence of Article III standing at all stages of the litigation." See Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv., No. 12-17530, 2015 WL 5451484, at *8 (9th Cir. Sept. 17, 2015). "To establish standing, organizations, like individuals, must satisfy the requirements of three elements: (1) injury-in-fact, (2) causation, and (3) redressability." Int'l Longshore & Warehouse Union v. Nelson, 599 F. App'x 701, 701 (9th Cir. 2015).

> "[A]n association has standing to bring suit on behalf of its members when: [1] its members would otherwise have standing to sue in their own right; [2] the interests it seeks to protect are germane to the organization's purpose; and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."

Id. at 702 (alterations in Nelson) (quoting Hunt v. Wash. State Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S. Ct. 2434, 53 L. Ed. 2d 383 (1977)).

However, the relevant injury "is not injury to the environment but injury to the plaintiff." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181 (2000). The Ninth Circuit has stated that:

> [E]nvironmental and aesthetic injuries constitute injuries in fact for standing purposes. See, e.g., Mount Graham Red Squirrel v. Espy, 986 F.2d 1568, 1581-82 (9th Cir. 1993) (extinction of species whose observation in the wild provided

plaintiffs scientific, recreational and aesthetic enjoyment conferred requisite injury for standing purposes); <u>Fund for Animals, Inc. v. Lujan</u>, 962 F.2d 1391, 1396 (9th Cir. 1992) (diminished opportunity for Fund members to view the northern bison herd in Yellowstone established standing to challenge the National Park Service's 1990 bison management plan); <u>Alaska Fish & Wildlife Fed'n and Outdoor Council, Inc. v. Dunkle</u>, 829 F.2d 933, 937 (9th Cir. 1987) (decrease in number of migratory birds resulting from a permissive hunting policy injured "those who wish to hunt, photograph, observe, or carry out scientific studies on the migratory birds").

<u>Desert Citizens Against Pollution v. Bisson</u>, 231 F.3d 1172, 1176-77 (9th Cir. 2000).  The Supreme Court has stated that "a plaintiff claiming injury from environmental damage must use the area affected by the challenged activity and not an area roughly 'in the vicinity' of it."  <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 565-66 (1992).

In the instant case, Plaintiff Center for Biological Diversity ("the Center") "is a nonprofit corporation that works through science, law and policy to secure a future for all species, great or small, hovering on the brink of extinction. . . .  The Center is dedicated to the preservation, protection, and restoration of biodiversity, native species, and ecosystems." [Pltfs.' CSOF, Decl. of Miyoko Sakashita ("Sakashita Decl.") at ¶ 3.[8]]  It has over 50,000 members, including "members who reside throughout Hawai`i and who use the areas that serve as habitat

---

[8] Miyoko Sakashita is the Center's director of ocean programs.  [Sakashita Decl. at ¶ 2.]

for the fish, marine mammals, sea turtles and other wildlife killed by the Hawai`i-based deep-set longline fishery."[9]  [Id.] For example, Robert Wintner is a Maui resident and a member of the TIRN.  He has been "an avid snorkeler and scuba diver for more than 60 years."  [Id., Decl. of Robert Wintner ("Wintner Decl.") ¶¶ 1, 3.]  Since 2004, he has dived between twenty to thirty times a year in the open ocean near Molokini, where he has observed various pelagic species, including yellowfin tuna, a species that the Hawai`i longline fishery kills as by-catch when fishing for bigeye tuna.  Although Wintner has never seen a bigeye tuna at Molokini, he knows others who have, and he hopes

---

[9] Similarly, Plaintiff Turtle Island Restoration Network ("TIRN") "is a nonprofit corporation that works through scientific research, legal and policy advocacy, education, and restoration efforts to protect marine and riparian wildlife globally" and to "preserv[e], protect[], and restor[e] . . . marine biodiversity, native species, and ecosystems."  [Pltfs.' CSOF, Decl. of Todd Steiner at ¶ 2.]  TIRN's members include Hawai`i residents "who use the areas that serve as habitat for the fish, marine mammals, sea turtles and other wildlife killed by the Hawai`i-based deep-set longline fishery."  [Id.] Todd Steiner is TIRN's executive director.  [Id. at ¶ 1.]

Plaintiff Conservation Council for Hawai`i ("CCH") is "a Hawai`i-based, non-profit citizens' organization" that "is the Hawai`i State affiliate of the National Wildlife Federation." [Pltfs.' CSOF, Decl. of Marjorie F.Y. Ziegler at ¶ 2.]  Its "mission is to protect native Hawaiian species and to restore native Hawaiian ecosystems for future generations."  [Id. at ¶ 3.]  "CCH members include wildlife biologists and others who study and enjoy native Hawaiian marine life, including the fish, marine mammal, sea turtle and sea bird species that would be harmed by the fishing activities that NMFS's Quota Shifting Rule would authorize."  [Id. at ¶ 6.]  Marjorie Ziegler is CCH's executive director.  [Id. at ¶ 1.]

to have a chance to observe and photograph bigeye tuna there in the future.  [Reply, Suppl. Decl. of Robert Wintner ("Wintner Suppl. Decl.") at ¶¶ 3-4.]  Wintner states:

> I am concerned that NMFS' Quota Shifting Rule will destabilize the marine ecosystem in this region and impact both pelagic and nearshore species and habitat by reducing stocks of bigeye tuna, a critical apex predator, as well as reducing stocks of ecologically valuable "by-catch" including seabirds, marine mammals, sea turtles, and other species.

[Wintner Decl. at ¶ 3.]

Colleen Rene Umberger, a Maui resident and member of CCH, is an avid scuba diver who has made over 10,000 dives - primarily in Hawai`i - in the past thirty years.  [Pltfs.' CSOF, Decl. of Colleen Rene Umberger ("Umberger Decl.") ¶¶ 1-2.]  While diving in pelagic ecosystems in Hawai`i and the Indo-Pacific, she has encountered several species of tuna, including bigeye tuna. [Suppl. Decl. of Colleen Rene Umberger ("Umberger Suppl. Decl."), filed 9/23/15 (dkt. no. 58-1), at ¶¶ 3-4]  She states that her "enjoyment of these areas is dependent on [her] ability to observe pelagic species, including the bigeye tuna, in their natural habitat," and her "recreational, spiritual and aesthetic interests are harmed by NMFS's Quota Shifting Rule because it allows longliners to remove beautiful marine animals from the ocean that contribute to the complex reef ecosystems [she] regularly dive[s] in for the purpose of observing marine animals in the wild."  [Umberger Decl. at ¶¶ 5, 7.]

Even viewing the record in the light most favorable to Defendants,[10] this Court finds that: 1) Plaintiffs are representing members who face, *inter alia*, actual and imminent environmental and aesthetic injuries from the alleged over-fishing of bigeye tuna; 2) the injuries are fairly traceable to the challenged Quota Shifting Rule; 3) the injuries are likely to be redressed by a favorable decision in this case because invalidating the Quota Shifting Rule would result in lower levels of bigeye tuna catch by Hawai`i longliners; 4) the interests that Plaintiffs seek to protect in this case are germane to their organizations' purposes; and 5) neither the claims asserted nor the relief requested in this case require the participation of Plaintiffs' members.  This Court therefore FINDS that there are no issues of material fact as to the standing issue, and CONCLUDES, as a matter of law, that Plaintiffs have standing to pursue the claims in this case.  See Fed. R. Civ. P. 56(a) (stating that a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law").  Plaintiffs' Motion is GRANTED as to the standing issue.

---

[10] This district court has stated that, in considering a motion for summary judgment, "[a]ll evidence and inferences must be construed in the light most favorable to the nonmoving party." Maui Elec. Co. v. Chromalloy Gas Turbine, LLC, Civil No. 12-00486 SOM-BMK, 2015 WL 1442961, at *4 (D. Hawai`i Mar. 27, 2015) (citing T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987)).

## II.  __Justiciability__

Defendants argue that, even if Plaintiffs have standing to pursue the claims in this case, the claims are not justiciable because they improperly seek to enforce international law.  In Defendants' view, the only recourse to address NMFS's allegedly erroneous interpretation and application of the Convention and the CMMs is to bring the United States's violations to the Commission's attention.  The Supreme Court has stated:

> This Court has long recognized the distinction between treaties that automatically have effect as domestic law, and those that — while they constitute international law commitments — do not by themselves function as binding federal law.  The distinction was well explained by Chief Justice Marshall's opinion in __Foster v. Neilson__, 2 Pet. 253, 315, 7 L. Ed. 415 (1829), overruled on other grounds, __United States v. Percheman__, 7 Pet. 51, 8 L. Ed. 604 (1833), which held that a treaty is "equivalent to an act of the legislature," and hence self-executing, when it "operates of itself without the aid of any legislative provision." __Foster__, *supra*, at 314. When, in contrast, "[treaty] stipulations are not self-executing they can only be enforced pursuant to legislation to carry them into effect." __Whitney v. Robertson__, 124 U.S. 190, 194, 8 S. Ct. 456, 31 L. Ed. 386 (1888).  In sum, while treaties "may comprise international commitments . . . they are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be 'self-executing' and is ratified on these terms." __Igartua-De La Rosa v. United States__, 417 F.3d 145, 150 (C.A.1 2005) (en banc) (Boudin, C. J.).

__Medellin v. Texas__, 552 U.S. 491, 504-05 (2008) (some alterations in __Medellin__).  The Supreme Court also clarified that: "What we mean by 'self-executing' is that the treaty has automatic

28

domestic effect as federal law upon ratification.  Conversely, a 'non-self-executing' treaty does not by itself give rise to domestically enforceable federal law.  Whether such a treaty has domestic effect depends upon implementing legislation passed by Congress."  Id. at 505 n.2.  Further,

> A treaty is, of course, "primarily a compact between independent nations." Head Money Cases, 112 U.S. 580, 598, 5 S. Ct. 247, 28 L. Ed. 798 (1884).  It ordinarily "depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it." Ibid.; see also The Federalist No. 33, p. 207 (J. Cooke ed. 1961) (A. Hamilton) (comparing laws that individuals are "bound to observe" as "the supreme law of the land" with "a mere treaty, dependent on the good faith of the parties"). **If these [interests] fail, its infraction becomes the subject of international negotiations and reclamations . . . .  It is obvious that with all this the judicial courts have nothing to do and can give no redress."** Head Money Cases, supra, at 598, 112 U.S. 580.  Only "[i]f the treaty contains stipulations which are self-executing, that is, require no legislation to make them operative, [will] they have the force and effect of a legislative enactment." Whitney [v. Robinson], [124 U.S. 190], 194, 8 S. Ct. 456 [(1888)].

Id. at 505-06 (some alterations in Medellin) (emphasis added).

As previously noted, the Implementation Act gives the Secretary the authority "to promulgate such regulations as may be necessary to carry out the United States international obligations under the WCPFC Convention and this chapter, including recommendations and decisions adopted by the Commission," 16 U.S.C. § 6904(a), and that authority has been

delegated to NMFS.  The Implementation Act and the regulations promulgated thereto are clearly enforceable in the United States. To the extent that Plaintiffs allege that NMFS exceeded its Implementation Act authority when it promulgated the Quota Shifting Rule, that claim is justiciable.

The Federal Defendants acknowledge that the Quota Shifting Rule was promulgated pursuant to the Magnuson-Stevens Act.  <u>See</u> Fed. Defs.' Opp. at 12-13 (quoting 79 Fed. Reg. at 64097-98 (stating that WESPAC "recommends conservation and management measures for NMFS to implement under the authority of" Magnuson-Stevens Act); 79 Fed. Reg. at 64106-07 ("NMFS is taking this action under the [Magnuson-Stevens Act], which authorizes NMFS to promulgate regulations necessary or appropriate to implement a plan amendment . . . ."); 79 Fed. Reg. at 64111 ("The authority citation for part 600 is revised to read as follows: Authority: 5 U.S.C. 561 and 16 U.S.C. 1801 <i>et seq.</i>")); <u>see also</u> Steen Decl., Exh. 1 (Amendment 7 EA) at 3-4 (abstract of the amendment).  Under the Magnuson-Stevens Act:

> (1) . . . actions described in paragraph (2) shall be subject to judicial review to the extent authorized by, and in accordance with, chapter 7 of Title 5, if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable; except that –
>
> . . . .

          (B)  the appropriate court shall only set aside any such regulation or action on a ground specified in section 706(2)(A), (B), (C), or (D) of such Title.

          (2)  The actions referred to in paragraph (1) are actions that are taken by the Secretary under regulations which implement a fishery management plan, including but not limited to actions that establish the date of closure of a fishery to commercial or recreational fishing.

        . . . .

16 U.S.C. § 1855(f).  To the extent that Plaintiffs bring a claim pursuant to the APA that the Quota Shifting Rule violates the Magnuson-Stevens Act, the claim is justiciable.

      First, as to Plaintiffs' Implementation Act claim, the Federal Defendants assert that the Quota Shifting Rule was only enacted pursuant to the Magnuson-Stevens Act.  However, they admit that "NMFS implemented 'technical administrative changes' to certain existing international fisheries requirements under the Implementation Act to make them consistent with the" Quota Shifting Rule.  [Federal Defs.' Response to Pltfs.' Concise Statement of Facts ("Federal Defs.' CSOF"), filed 8/21/15 (dkt. no. 55), at ¶ 19 (citing 79 Fed. Reg. at 640 (stating that the rule "also makes several technical administrative changes to the regulations").]  In addition, the Quota Shifting Rule's List of Subjects includes 50 C.F.R. Part 300, "Administrative practice and procedure, Fish, Fisheries, Fishing, Marine resources, Reporting and recordkeeping requirements, Treaties."  79 Fed.

Reg. at 64110.  Part 300, Subpart O, titled "Western and Central Pacific Fisheries for Highly Migratory Species," states: "This subpart implements provisions of the Western and Central Pacific Fisheries Convention Implementation Act (Act) and applies to persons and vessels subject to the jurisdiction of the United States."  50 C.F.R. § 300.210.  One of the regulations in Subpart O is 50 C.F.R. § 300.224, "Longline fishing restrictions."  That regulation is clearly part of the management framework implemented in the Quota Shifting Rule.  See, e.g., 79 Fed. Reg. at 64100 (stating that "NMFS has already implemented the 3,763 mt catch limit for longline-caught bigeye tuna for the United States for 2014" (citing 50 CFR 300.224)).  Thus, even though the Quota Shifting Rule does not expressly invoke NMFS's Implementation Act authority, see, e.g., id. at 64106 ("NMFS is taking this action under the Magnuson-Stevens Act."), this Court concludes that the rule is clearly part of the regulatory system authorized in the Implementation Act.

Defendants next argue that Plaintiffs do not seek review of the Quota Shifting Rule pursuant to either the Implementation Act or the Magnuson-Stevens Act.  According to Defendants, Plaintiffs' claims actually allege violations of the CMMs, which are not domestically enforceable.  Defendants urge this Court to follow the analysis in Natural Resources Defense Council v. Environmental Protection Agency, 464 F.3d (D.C. Cir.

2006), in which the D.C. Circuit held that post-ratification decisions by the parties to the Montreal Protocol on Substances that Deplete the Ozone Layer ("Montreal Protocol"), Sept. 16, 1987, S. Treaty Doc. NO. 100-10, 1522 U.N.T.S. 29, were not enforceable in United States courts.

Similar to the instant case: the United States entered into the Montreal Protocol with various other countries; the Senate ratified the treaty in 1988; and Congress implemented it by incorporating the terms of the protocol in the Clean Air Act. The Montreal Protocol "requires signatory nations . . . to reduce and eliminate their production and use of ozone-depleting chemicals in accordance with agreed-upon timetables." NRDC, 464 F.3d at 3 (citing Montreal Protocol arts. 2-21). The Montreal Protocol allows for exceptions from the ban for production and consumption that is necessary for critical uses, and the parties meet annually to determine the critical uses and how much production and consumption is necessary for the critical uses. Id. at 4. At a March 2004 meeting, the parties to the Montreal Protocol agreed upon Decision ExI/3 and Decision XI/6. The Environmental Protection Agency ("EPA") promulgated rules to implement the critical use exceptions. Id. at 5. The NRDC brought suit to challenge the rule, arguing that it violated Decision ExI/3 and Decision XI/6 on various grounds. Id. The D.C. Circuit held that:

33

> The "decisions" of the Parties – post-ratification
> side agreements reached by consensus among 189
> nations – are not "law" within the meaning of the
> Clean Air Act and are not enforceable in federal
> court.
>
> . . . .
>
> . . . If the "decisions" are "law" –
> enforceable in federal court like statutes or
> legislative rules – then Congress either has
> delegated lawmaking authority to an international
> body or authorized amendments to a treaty without
> presidential signature or Senate ratification, in
> violation of Article II of the Constitution. . . .

Id. at 8.  The Eighth Circuit recognized that, when Congress

implemented the Montreal Protocol, it directed the EPA to abide

by the Protocol's terms.  Id. at 9 (citing 42 U.S.C.

§§ 7671(d)(6), 7671m(b)).  More importantly, however:

> Nowhere does the Protocol suggest that the
> Parties' post-ratification consensus agreements
> about how to implement the critical-use exemption
> are binding in domestic courts.  The only
> pertinent language in Article 2H(5) states that
> the Parties will "decide to permit" production and
> consumption necessary to satisfy those uses that
> they "agree[]" to be critical uses.  The Protocol
> is silent on any specific conditions accompanying
> the critical-use exemption.  Post-ratification
> agreements setting these conditions are not the
> Protocol.

Id. (alteration in NRDC).  The decisions could not be subsequent

interpretations of the Montreal Protocol because the Protocol did

not contain details about the critical-use exemption.  Instead of

"interpret[ing] treaty language," the decisions "fill[ed] in

treaty gaps," and therefore could not be considered

interpretations and applications of the Protocol.  Id. at 9.  The

D.C. Circuit held that article 2H(5) – the only provision addressing critical uses – was merely an "agreement to agree," which was unenforceable in contract. <u>Id.</u> at 9-10.  In other words, "[w]ithout congressional action, . . . side agreements reached after a treaty has been ratified are not the law of the land; they are enforceable not through the federal courts, but through international negotiations." <u>Id.</u>

This Court, however, finds that there are critical differences between the Montreal Protocol and its implementing statute and the instant Convention and the Implementation Act. First, unlike the Montreal Protocol, the Convention expressly states that the Commission shall, *inter alia*:

> (a) **determine the total allowable catch or total level of fishing effort** within the Convention Area for such highly migratory fish stocks as the Commission may decide and **adopt such other conservation and management measures and recommendations as may be necessary** to ensure the long-term sustainability of such stocks;
>
> . . . .
>
> (c) **adopt, where necessary, conservation and management measures and recommendations** for nontarget species and species dependent on or associated with the target stocks, with a view to maintaining or restoring populations of such species above levels at which their reproduction may become seriously threatened; [and]
>
> . . . .
>
> (g) **develop, where necessary, criteria for the allocation of the total allowable catch or the**

> **total level of fishing effort** for highly migratory
> fish stocks in the Convention Area[.]

[Henkin Decl., Exh. 4 (Convention) at art. 10, § 1 (emphases added).]   Further, unlike the Montreal Protocol, the Convention contemplates that the Commission members will enforce the CMMs. The Convention requires the members to, *inter alia*:

- "implement and enforce conservation and management measures through effective monitoring, control and surveillance"; [id. at art. 5, § j;]

- "promptly implement the provisions of this Convention and any conservation, management and other measures or matters which may be agreed pursuant to this Convention"; [id. at art. 23, § 1;] and

- "take such measures as may be necessary to ensure that . . . fishing vessels flying its flag comply with the provisions of this Convention and the conservation and management measures adopted pursuant hereto and that such vessels do not engage in any activity which undermine the effectiveness of such measures" [id. at art. 24, § 1(a)].

Finally, unlike the Clean Air Act's implementation of the Montreal Protocol, the Implementation Act expressly authorizes NMFS "to promulgate such regulations as may be necessary to carry out the United States international obligations under the WCPFC Convention and this chapter, including recommendations and **decisions adopted by the Commission**."   16 U.S.C. § 6904(a) (emphasis added).   For these reasons, this Court concludes that the CMMs are distinguishable from the decisions described in NRDC, and this Court declines to follow the reasoning set forth in that case.

36

Further, this Court concludes that NMFS - pursuant to the Implementation Act and the Magnuson-Stevens Act - adopted the Quota Shifting Rule, which it believes is necessary to carry out the United States's obligations in the relevant CMMs.  The Quota Shifting Rule clearly treats certain CMMs - in particular CMM 2013-01 - as authoritative and asserts that the rule follows them.  For example, the Quota Shifting Rule states:

-"This final rule is consistent with the WCPFC CMM 2013-01 objectives of ending overfishing of bigeye tuna, while allowing for the limited transfer of available quota between U.S. participating territories and eligible U.S. fisheries." 79 Fed. Reg. at 64098.

-"This action is consistent with WCPFC CMM 2013-01, and other applicable laws."  Id.

-"NMFS . . . will implement the U.S. catch limits specified in CMM 2013-01 for subsequent years in one or more separate rulemakings, as appropriate."  Id. at 64100.

-"As documented in the EA, catches by Hawaii and territory longline fisheries, when combined with U.S. WCPO longline limit for bigeye tuna of 3,763 mt per year (which will be reduced in 2015 and again in 2017) would not impede the CMM 2013-01 objective of ending overfishing on bigeye tuna." Id.

-"This final rule is consistent with CMM 2013-01 for longline-caught yellowfin tuna and the fishing effort limits for albacore under CMM 2005-02. . . .  This final rule does not undermine the WCPFC's measures for silky sharks or oceanic whitetip sharks under CMMs 2013-08 and 2011-04, respectively."  Id.

-"The management framework implemented by this rule requires the Council to review any proposed and existing catch or fishing effort limits and allocation limits at least annually to ensure consistency with the FEP, Magnuson-Stevens Act, **WCPFC decisions**, and other applicable laws."  Id. at 64101 (emphasis added).

37

-"NMFS reviews the recommended limits for consistency with all applicable laws and WCPFC CMMs and, if consistent, NMFS will approve the recommendation."  Id.

Thus, insofar as the Quota Shifting Rule makes CMM 2013-01 and other CMMs part of the regulatory scheme promulgated pursuant to the Implementation Act and the Magnuson-Stevens Act, this Court concludes that those CMMs are domestically enforceable.  Because the relevant CMMs are domestically enforceable, this Court CONCLUDES that Plaintiffs' claims are justiciable.  Plaintiffs' Motion is therefore GRANTED as to the justiciability issue.

This Court now turns to the merits of Plaintiffs' claims.

### III. Alleged Violation of CMM 2013-01

The gravamen of Plaintiffs' case is that the Quota Shifting Rule violates CMM 2013-01, which is binding authority for purposes of the rule.  As previously noted, CMM 2013-01 set the following bigeye tuna catch limits for the United States: 2014 - 3,763 mt; 2015 - 3,554 mt; 2016 - 3,554 mt; and 2017 - 3,345 mt.  [Steen Decl., Exh. 2 (CMM 2013-01), at 21 (Attachment F (Bigeye Longline Catch Limits by Flag)).]  The Quota Shifting Rule allows each U.S. PT to "allocate up to 1,000 mt of [its] limit to eligible U.S. longline fishing vessels."  79 Fed. Reg. at 64097.  Plaintiffs argue that the rule violates CMM 2013-01 for several reasons.

A.  **Catch Limits Applicable to the U.S. PTs**

In the Quota Shifting Rule, NMFS takes the position that "individual catch limits do not apply to the U.S. participating territories under CMM 2013-01," and the rule "specif[ies] a longline bigeye tuna catch limit of 2,000 mt for each U.S. participating territory."  79 Fed. Reg. at 64098. Plaintiffs first argue that this interpretation of CMM 2013-01 is not supported by the measure's language.  Plaintiffs emphasize that the only exception to paragraph 5's rule attributing catch to the flag State is the CMM 2011-05 charter.  Thus, they argue that the U.S. PTs are not separate entities for purposes of catch allocation because any catch by a U.S. PT counts against the United States's limit.  The Quota Shifting Rule explains the NMFS's position as follows:

> [WESPAC] based the 2,000-mt limit for each
> U.S. territory on past limits provided to WCPFC
> members that harvested less than 2,000 mt annually
> in previous CMMs (2008-01 and 2011-01), and which
> is currently set forth in paragraph 41 of
> CMM 2013-01.  Paragraph 41 states that each member
> that caught less than 2,000 mt of bigeye in 2004
> ensure that its catch does not exceed 2,000 mt in
> each of the next 4 years (2014, 2015, 2016, and
> 2017).  However, paragraph 7 of CMM 2013-01
> exempts [Small Island Developing States ("SIDS")]
> and PTs from the 2,000 mt annual limit meaning
> that, under WCPFC decisions, these members are not
> subject to individual bigeye limits.  This final
> rule would effectively remove that exemption and
> make American Samoa, Guam, and the CNMI subject to
> 2,000 mt limits for 2014.

79 Fed. Reg. at 64103.  The issue before this Court is whether

this interpretation of CMM 2013-01 is either arbitrary and capricious or exceeds NMFS's authority.

As previously noted, CMM 2013-01 states that Attachment F sets forth the bigeye tuna catch limits for 2014 and beyond, and that "[a]ny overage of the catch limit by a **CCM** shall be deducted from the catch limit for the following year for that **CCM**." [Steen Decl., Exh. 2 (CMM 2013-01) at 10, ¶ 40 (emphases added).] Paragraph 41 exempts certain Commission **members** from the effect of paragraph 40, and it states that the Commission will decide **non-members**' opportunities on a case by case basis. [Id. at 10, ¶ 41.] However, CCMs also include PTs, see, e.g., Henkin Decl., Exh. 8 (CMM 2005-01) at 2, and paragraph 41 does not address catch limits or opportunities for PTs. CMM 2013-01 does not expressly establish catch limits for PTs, but neither does it expressly state that each PT's catch is attributed to "the Contracting Party having responsibility for its international affairs." See Convention at art. 43, § 1.

Plaintiffs' position is premised upon paragraph 5, which states that - for purposes of inter alia, paragraph 40 - "attribution of catch and effort shall be to the flag State." [Steen Decl., Exh. 2 (CMM 2013-01) at 3, ¶ 5.] CMM 2013-01, however, does not define "flag State." It includes a reference to "Member flag States," [Id. at 5, ¶ 13,] which suggests that "Member" and "flag State" are not synonymous and that there are

40

"flag States" that are not "Members."  This weighs against
Plaintiffs' argument that paragraph 5 requires that a U.S. PT's
catch be attributed to the United States.

In short, while this Court acknowledges that CMMs are not
treaties, they are post-ratification decisions adopted by a body
created pursuant to a treaty, and the purpose of the CMMs is to
implement the Convention, a treaty.  Therefore, in interpreting
CMM 2013-01, this Court is guided by the principles governing the
interpretation of treaties.  The Supreme Court has stated:

> The interpretation of a treaty, like the
> interpretation of a statute, begins with its text.
> Air France v. Saks, 470 U.S. 392, 396-397, 105 S.
> Ct. 1338, 84 L. Ed. 2d 289 (1985).  Because a
> treaty ratified by the United States is "an
> agreement among sovereign powers," we have also
> considered as "aids to its interpretation" the
> negotiation and drafting history of the treaty as
> well as "the postratification understanding" of
> signatory nations.  Zicherman v. Korean Air Lines
> Co., 516 U.S. 217, 226, 116 S. Ct. 629, 133 L. Ed.
> 2d 596 (1996).

Medellin, 552 U.S. at 506-07 (some citations omitted).  This
Court concludes that the text of CMM 2013-01 is ambiguous as to
the issue of whether PTs are separate entities from their
responsible Contracting Parties for purposes of catch allocation
limits, and this Court will look to the prior relevant CMMs to
aid its interpretation of CMM 2013-01.

CMM 2013-01 states that it replaces CMM 2012-01.
[Steen Decl., Exh. 2 (CMM 2013-01) at 13, ¶ 57.]  CMM 2012-01
states that it replaces CMM 2008-01 and CMM 2011-01.  [Id.,

41

Exh. 11 (CMM 2012-01), at 10, ¶ 34.]   Further, the Quota Shifting

Rule states that NMFS previously implemented the United States's

2014 catch limit pursuant to CMM 2012-01.   79 Fed. Reg. at 64098

(citing 78 FR 58240, September 23, 2013).   NMFS also relied on

CMM 2008-01 and CMM 2011-01 as authority to support its

interpretation of CMM 2013-01 in the Quota Shifting Rule.   Id. at

64108 ("[N]othing in CMM 2013-01 or predecessor decisions of the

WCPFC requires that vessels operate under charters for purposes

of catch attribution.   To the contrary, CMM 2011-01 incorporated

paragraph 2 of CMM 2008-01.").   Thus, this Court concludes that –

in addition to CMM 2013-01, discussed *supra* Discussion Section II

– CMM 2008-01, CMM 2011-01, and CMM 2012-01 are domestically

enforceable in this action because they are relevant measures

that NMFS has included in the regulatory scheme promulgated

pursuant to the Implementation Act and the Magnuson-Stevens Act.

        Attachment F to CMM 2013-01 only lists the catch limits

"by Flag" for China, Indonesia, Japan, the Republic of Korea,

Chinese Taipei, and the United States.   These are described as

"CCMs."   [Steen Decl., Exh. 2 (CMM 2013-01) at 21 (Attachment

F).]   Of these CCMs, the United States's limits are the lowest.

In contrast, Attachment F to CMM 2012-01, which also listed

limits "by Flag," listed thirty-two CCMs.   In addition to China,

Indonesia, Japan, the Republic of Korea, Chinese Taipei, and the

United States, Attachment F to CMM 2012-01 listed the catch

42

limits for: Australia (2,000); Belize (803); European Union (2,000); New Zealand (2,000); and Philippines (2,000).  There were no catch limits specified for the other CCMs, which included the U.S. PTs.  [Id., Exh. 11 (CMM 2012-01) at 18 (Attachment F).] Like CMM 2013-01, CMM 2012-01 stated that, for purposes of the catch limits in Attachment F, "attribution of catch and effort shall be to the flag State."  [Id. at 4, ¶ 5 & 8, ¶ 26.] CMM 2012-01 does not define "flag State," but the listing of PTs among the CCMs listed "by Flag" in Attachment F weighs against Plaintiffs' interpretation.  In addition, CMM 2012-01 states: "CCMs shall take necessary measures to ensure that the total effort and capacity of their respective other commercial tuna fisheries for bigeye . . . tuna but excluding those fisheries taking less than 2,000 tonnes of bigeye, . . . shall not exceed the average level for the period 2001-2004 or 2004."  [Id. at 9, ¶ 30.]

Attachment F to CMM 2008-01, titled "Baseline Longline Bigeye Tuna Catches, by Flag,"[11] listed twenty-seven CCMs, including American Samoa, which caught an average of 185 mt from 2001 to 2004.  [Steen Decl., Exh. 3 (CMM 2008-01) at 41 (Attachment F).]  Guam and the CNMI are not included on the list,

---

[11] CMM 2011-01 states that, with two exceptions that are not relevant here, "[t]he measures applicable for 2011 under CMM 2008-201 shall remain in effect until 28 February, 2013."  [Steen Decl., Exh. 10 (CMM 2011-01) at 1, ¶ 1.]

and the parties agree that those two territories do not engage in longline fishing for bigeye tuna.

CMM 2008-01 states, in pertinent part:

31.  The total catch of bigeye tuna by longline fishing gear will be subject to a phased reduction such that by 1 January 2012 the longline catch of bigeye tuna is 70% of the average annual catch in 2001-2004 or 2004 (Attachment F). . . .

32.  **Paragraph 31 does not apply to members and participating territories that caught less than 2,000 tonnes in 2004.**  Each member that caught less than 2,000 tonnes of bigeye in 2004 shall ensure that their catch does not exceed 2,000 tonnes in each of the next 3 years (2009, 2010 and 2011).  Consistent with paragraph 3 opportunities for non members will be decided by the Commission on a case by case basis.

33.  Each member or cooperating non-Member that caught an average of more than 2,000 tonnes of bigeye shall be subject to the following catch limits for bigeye tuna for the years 2009 to 2011 inclusive:

> 2009: 10% reduction of the catch specified in Attachment F;
>
> 2010: 20% reduction of the catch specified in Attachment F;
>
> 2011: 30% reduction of the catch specified in Attachment F.

34.  In accordance with paragraph 6, **the limits for bigeye tuna established in paragraphs 31 to 33 above, shall not apply to** small island developing State members and **participating territories in the Convention Area undertaking responsible development of their domestic fisheries**.

[Id. at 7-8 (emphases added) (footnote omitted).[12]]

Thus, under CMM 2008-01, the required reduction in bigeye tuna catch did not apply to PTs that caught less than 2,000 mt in 2004 (like American Samoa), nor did the reductions apply to PTs that were responsibly developing their domestic fisheries.  The reductions would not have applied if either Guam or CNMI decided to develop its bigeye tuna fishery, and it did so in a responsible manner.  Under CMM 2012-01, the exemption continued for PTs (and all other CCMs) catching less than 2,000 mt of bigeye tuna.  Although CMM 2013-01 continued the exemption for members catching less than 2,000 mt, it neither continued nor abolished the exemption for PTs catching less than 2,000 mt.  It was silent as to the PTs' catch limits.

Requiring each PT to attribute its catch to its responsible Contracting Party would be a major policy change. This Court does not believe the Commission would make such a change without expressly setting forth the change.  Further, such an implicit change would be contrary to other policy statements in CMM 2013-01.  The Preamble of CMM 2013-01 notes that:

---

[12] Although CMM 2005-01 is not one of the relevant measures incorporated in the Quota Shifting Rule, this Court notes it exempted all CCMs that caught less than 2,000 mt in 2004 from the catch limits, except that those CCMs were required to "ensure that their catch does not exceed 2,000 tonnes in each of the next 3 years."  [Henkin Decl., Exh. 8 (CMM 2005-01) at 3, ¶¶ 17-18.] CMM 2008-01 replaced CMM 2005-01 and CMM 2006-01.  [Steen Decl., Exh. 3 (CMM 2008-01) at 9, ¶ 47.]

> Article 30(2) of the Convention requires the
> Commission to take into account the special
> requirements of developing States, in particular
> small island developing States and Territories.
> This includes **ensuring that conservation and
> management measures adopted by it do not result in
> transferring, directly or indirectly, a
> disproportionate burden of conservation action
> onto** developing States, Parties and **Territories**[.]

[Steen Decl., Exh. 2 (CMM 2013-01) at 2 (emphases added.]

CMM 2013-01 also states: "Unless otherwise stated, nothing in

this Measure shall prejudice the rights and obligations of those

small island developing State Members and Participating

Territories in the Convention Area seeking to develop their

domestic fisheries." [Id. at 4, ¶ 7.]   The Commission also

recognized these policies in CMM 2012-01 and CMM 2008-01.  [Steen

Decl., Exh. 11 (CMM 2012-01) at 2 & 4, ¶ 7; id., Exh. 3

(CMM 2008-01) at 2 & 3, ¶ 6.]   Further, in CMM 2008-01, the

Commission expressly cited the paragraph regarding the

development of domestic fisheries as support for the PTs'

exemptions from catch reductions.  [Steen Decl., Exh. 3 at 8,

¶ 34.]

Not only is CMM 2013-01 silent on the purported change

in the policy regarding the allocation of the PTs' bigeye tuna

catch, the Commission's Summary Report of the session during

which that measure was adopted does not reflect any discussion of

the purported change.  The "Tropical Tuna Measure," which

eventually became CMM 2013-01, was Agenda Item 4 in the

Commission's Tenth Regular Session from December 2 to 6, 2013. [Administrative Record ("AR"), Exh. D57 (Summary Report) at 6233, 6248-52.]  In fact, during the "informal small group sessions" held to discuss revisions to the proposed version, issues regarding "disproportionate burdens" were among the "contentious issues" addressed.  [Id. at 6251.]  As further evidence of the Commission's particular concern that it must avoid placing a disproportionate burden of conservation on SIDS and territories, the Commission also adopted:

-CMM 2013-06 (Conservation and Management Measure on the Criteria for the Consideration of Conservation and Management Proposals);[13] [AR, Exh. D49 at 6089-90;] and

_____

[13] CMM 2013-06 stated, _inter alia_:

    1.    CCMs shall develop, interpret and apply conservation and management measures in the context of and in a manner consistent with the 1982 Convention and Articles 24, 25 and 26 of the Agreement.  To this end, CCMs shall cooperate, either directly or through the Commission, to enhance the ability of developing States, particularly the least developed among them and SIDS and territories in the Convention Area, to develop their own fisheries for highly migratory fish stocks, including but not limited to the high seas within the Convention Area.

    2.    The Commission shall ensure that any conservation and management measures do not result in transferring, directly or indirectly, a disproportionate burden of conservation action onto SIDS and territories.

[AR, Exh. D49 at 6089-90.]

-CMM 2013-07 (Conservation and Management Measure on the Special Requirements of Small Island Developing States and Territories)[14] [Steen Decl., Exh. 14].

Thus, the interpretation of CMM 2013-01 that Plaintiffs advocate – in which PTs are no longer recognized as separate entities for purposes of catch allocation – is inconsistent with the Convention's and the Commission's policies, and it is not supported by the record of the Commission's session during which the measure was adopted.

A change in policy like the interpretation that Plaintiffs advocate would prejudice the rights of a PT seeking to develop its domestic fishery.  In light of paragraphs 5 and 7 in CMM 2013-01, the Commission would not have made such a significant change without expressly setting forth the change in the measure.  For example, Plaintiffs describe the American Samoa bigeye tuna fishery as catching an average of a few hundred mt per year.  In 2016, the United States's catch limit will be 3,554 mt (assuming that there is no deduction for overage in 2015), which is already a reduction from its limit of 3,763 mt in 2013.  Once the Hawai`i-based fishery reaches the United States's

---

[14] CMM 2013-07 contains provisions identical to paragraphs 1-2 of CMM 2013-06.  [Steen Decl., Exh. 14 (CMM 2013-07) at 2, ¶¶ 2-3.]  In addition, CMM 2013-07 states: "Notwithstanding other special requirements of SIDS and territories not identified herein, CMMs shall fully recognise the special requirements of SIDS and territories in the Convention Area in the implementation of the Convention this measure and other measures."  [Id. at 1-2, ¶ 1.]

limit, NMFS will close the fishery for the remainder of the year. Requiring American Samoa to attribute its catch to the United States would put a disproportionate burden of conservation efforts on it and would prejudice its ability to develop its fishery.  The American Samoa fishery would likely be unable to catch its annual average, let alone a larger amount if it decided to responsibly expand its fishery.  The more sophisticated Hawai`i-based longline fishery – already faced with a reduced catch limit – would likely reach the United States's annual catch limit before American Samoa reached its annual average, and the fishery for the United States and all of the U.S. PTs would be closed thereafter.  Further, the Hawai`i-based longline fishery would have no incentive to support the development of the American Samoa fishery because the expansion of the American Samoa fishery would reduce the amount of bigeye tuna that the Hawai`i-based fishery could catch.

For these reasons, this Court rejects Plaintiffs' proffered interpretation and concludes that the Quota Shifting Rule's interpretation of CMM 2013-01 as treating the U.S. PTs as separate entities for purposes of catch allocation is consistent with the Convention, the relevant historical CMMs, and what occurred at the Commission's Tenth Session.  Cf. Air France v. Saks, 470 U.S. 392, 400 (1985) (agreeing with the interpretation of the treaty that was "consistent with the negotiating history

49

of the [Warsaw] Convention, the conduct of the parties to the
Convention, and the weight of precedent in foreign and American
courts"). This Court therefore CONCLUDES that the Quota Shifting
Rule's interpretation of CMM 2013-01 as treating the U.S. PTs as
separate entities for purposes of catch allocation is not
arbitrary and capricious, and does not exceed NMFS's authority.

   **B.   Reallocation of the U.S. PTs' Limits**

        Plaintiffs next argue that, even if the U.S. PTs have
catch limits that are separate from the United States's limit,
the Quota Shifting Rule violates the Implementation Act and the
Magnuson-Stevens Act because CMM 2013-01 does not permit the type
of reallocation agreements like the specified fishing agreements
allowed in the Quota Shifting Rule. As previously noted,
Plaintiffs emphasize that, for purposes of the CMM 2013-01 catch
limits, "attribution of catch and effort shall be to the flag
State, except that catches and effort of vessels notified as
chartered under CMM 2011-05 shall be attributed to the chartering
Member, or Participating Territory." [Steen Decl., Exh. 2
(CMM 2013-01) at 3, ¶ 5.]

        In response to the comment that the specified fishing
agreements "do not constitute charter arrangements under
CMM 2011-05," NMFS stated, *inter alia*:

            Acting pursuant to the directive of Section 113,
            the Council also prepared an amendment and final
            rule that establishes a management framework for
            specifying catch and fishing effort limits and

accountability measures for pelagic fisheries in
the territories under the Magnuson-Stevens Act,
including provisions that would allow for the
limited transfer of quota from U.S. participating
territories to eligible U.S. fishing vessels,
consistent with the conservation needs of the
affected stocks. . . .

. . . [N]othing in CMM 2013-01 or predecessor
decisions of the WCPFC requires that vessels
operate under charters for purposes of catch
attribution.  To the contrary, CMM 2011-01
incorporated paragraph 2 of CMM 2008-01, which
provided that vessels operated under "charter,
lease or similar mechanisms" by developing states
and participating territories, as an integral part
of their domestic fleet, would be considered to be
vessels of the host island State or territory.

79 Fed. Reg. at 64108.  CMM 2008-01 stated that: "For the

purposes of these measures, vessels operated under charter, lease

or other similar mechanisms by developing islands States and

participating territories, as an integral part of their domestic

fleet, shall be considered to be vessels of the host island State

or territory."  [Steen Decl., Exh. 3 at 3, ¶ 2.]  This provision

was continued in CMM 2011-01.  [Id., Exh. 10 at 1, ¶ 1.]  In

addition, in 2011, the Commission adopted CMM 2011-05, which

applied to:

Commission Members and Participating Territories
that charter, lease or enter into other mechanisms
with vessels eligible under Para.4 flagged to a
another State or Fishing Entity for the purpose of
conducting fishing operations in the Convention
Area as an integral part of the domestic fleet of
that chartering Member or Participating Territory.

51

[Henkin Decl., Exh. 30 at 1, ¶ 1.[15]]  CMM 2011-05 acknowledged

"the important contribution of chartered vessels to sustainable

fisheries development in the Western & Central Pacific Ocean[.]"

[Id. at 1.]

Paragraph 5 of CMM 2013-01, read together with

paragraph 1 of CMM 2011-05, continues to authorize catch

---

[15] Plaintiffs note that CMM 2011-05 is not part of the administrative record. They argue that this Court should take judicial notice of it pursuant to Fed. R. Evid. 201 because it is a relevant factor to the promulgation of the Quota Shifting Rule. [Mem. in Supp. of Motion at 29 n.10.]  Rule 201 states, in pertinent part:

(b)  Kinds of Facts That May Be Judicially Noticed.  The court may judicially notice a fact that is not subject to reasonable dispute because it:

(1)  is generally known within the trial court's territorial jurisdiction; or

(2)  can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.

(c) Taking Notice.  The court:

(1)  may take judicial notice on its own; or

(2)  must take judicial notice if a party requests it and the court is supplied with the necessary information.

CMM 2011-05 is part of the Commission's records, and it is available on the Commission's website.  It is relevant to the issues before this Court because it is addressed in the Quota Shifting Rule.  See, e.g., 79 Fed. Reg. at 64108.  This Court therefore FINDS that CMM 2011-05 is subject to judicial notice pursuant to Rule 201(b)(2), and GRANTS Plaintiffs' request.

allocation agreements, if the vessels are an integral part of the member's or PT's domestic fleet.  Neither CMM 2013-01 nor CMM 2011-05 sets forth a standard to determine whether a vessel is an integral part of another domestic fleet.  As previously noted, WESPAC proposed Amendment 7, which resulted in the Quota Shifting Rule, pursuant to Section 113.  Section 113 stated that the U.S. PTs may enter into catch allocation agreements with United States vessels with FMP permits for the Western Pacific Region, and, when vessels operate under such arrangements, they are integral to the U.S. PTs' domestic fisheries.  Public Law No. 112-55, 125 Stat. 552, 603.

Plaintiffs argue that Section 113 did not require NMFS to deem United States vessels to be an "integral part" of the U.S. PTs' domestic fleets based on specified fishing agreements. Specifically, they contend that: 1) Section 113 could not be the authority for any action in the Quota Shifting Rule because it had lapsed by the time the Quota Shifting Rule was promulgated; 2) the Quota Shifting Rule's treatment of vessels operating under specified fishing agreements as essential was a departure from prior NMFS policy, and the rule did not provide sufficient justification for the departure; and 3) the interpretation of "integral part" in Section 113 and the Quota Shifting Rule is inconsistent with CMM 2011-05.

As to Plaintiffs' first argument, Section 113(c) – the sunset provision – stated:

> Subsection (a) shall remain in effect until the earlier of December 31, 2012, or such time as –
>
> > (1)  the Western Pacific Regional Fishery Management Council recommends an amendment to the Pelagics Fishery Management Plan for the Western Pacific Region, and implementing regulations, to the Secretary of Commerce that authorize use, assignment, allocation, and management of catch limits of highly migratory fish stocks, or fishing effort limits, established by the Commission and applicable to U.S. Participating Territories;
> >
> > (2)  the Secretary of Commerce approves the amendment as recommended; and
> >
> > (3)  such implementing regulations become effective.

Congress later extended Section 113 through December 31, 2013. See Consolidated and Further Continuing Appropriations, 2013, Division B, Title I (Department of Commerce), § 110.

Plaintiffs' position is that a regulation relying upon the Section 113 interpretation of "integral part" would only have been valid if the regulation became effective before Section 113 lapsed.  However, although Section 113(c) states that Section 113(a) would cease to be effective if implementing regulations became effective before the sunset date, nothing in Section 113 **required** the implementing regulations to become effective before that date.  Section 113(b)(3) required WESPAC to "recommend an amendment to the Pelagics Fishery Management Plan

54

for the Western Pacific Region, and associated regulations, to implement this section."  WESPAC did propose Amendment 7 prior to December 31, 2013, and nothing in Section 113 precluded the **effect** of that action to extend beyond the sunset date.  Cf. Republic of Iraq v. Beaty, 556 U.S. 848, 865 (2009) ("We think the better reading of the eighth [Emergency Wartime Supplemental Appropriations Act] proviso (the sunset clause) is that the powers granted by the section could be exercised only for a limited time, but that actions taken by the President pursuant to those powers . . . would not lapse on the sunset date.").  This Court therefore concludes that the lapse of Section 113 before the effective date of the Quota Shifting Rule did not render the Quota Shifting Rule invalid.

Plaintiffs are correct that the interpretation of "integral part" in the Quota Shifting Rule departed from the interpretation in previous NMFS regulations.  For example, NMFS, NOAA, and Department of Commerce's Final rule regarding International Fisheries; Western and Central Pacific Fisheries for Highly Migratory Species; Bigeye Tuna Catch Limits in Longline Fisheries in 2009, 2010, and 2011 stated:

> Under the proposed rule, bigeye tuna catches would be attributed based upon the place of landing, which closely aligns with the past practice of NMFS in its reporting to the WCPFC.  NMFS believes that fish caught by a Hawaii- or West Coast-based vessel on the high seas or in the portion of the EEZ surrounding the Hawaiian Archipelago and subsequently landed in Hawaii **acquire little or no**

55

**nexus with a Participating Territory, and ordinarily are not attributable to that Territory for reporting purposes to the WCPFC.**  CMM 2008-01 does provide that when a vessel is operating under a charter, lease, or similar arrangement as an "integral part" of a host Participating Territory's domestic fleet, it shall be considered a vessel of the host Participating Territory for example, its catch should be attributed to the host Participating Territory's fishery for WCPFC reporting purposes.  Although NMFS does not rule out the possibility that Hawaii- and West Coast-based vessels might operate under charter agreements with U.S. Participating Territories, such arrangements must be consistent with the applicable FMP and U.S. laws and regulations. Moreover, **NMFS does not believe that CMM 2008-01 requires NMFS to assign catches to the chartering Participating Territory without regard to where the fish are caught or landed, particularly where the Participating Territory's sole connection to the vessel and its catch is the contractual relationship established by the charter agreement.** Accordingly, a determination would have to be made by NMFS as to whether such vessels are operating as an "integral part" of the U.S. Participating Territory's domestic fleet.  To conclude otherwise would allow practices that undercut the important conservation objectives of CMM 2008-01.  However, NMFS recognizes that in certain circumstances a Participating Territory may acquire a sufficient nexus to a catch even if it is not landed within its borders . . . .

74 Fed. Reg. 63999, 64002 (Dec. 7, 2009) (emphases added).

Plaintiffs argue that the Quota Shifting Rule is arbitrary and capricious because it does not include an adequate explanation for the change in agency policy.  The Supreme Court has stated that:

the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it **is** changing

56

> position.  An agency may not, for example, depart
> from a prior policy *sub silentio* or simply
> disregard rules that are still on the books.  See
> United States v. Nixon, 418 U.S. 683, 696, 94 S.
> Ct. 3090, 41 L. Ed. 2d 1039 (1974).  And of course
> the agency must show that there are good reasons
> for the new policy.  But it need not demonstrate
> to a court's satisfaction that the reasons for the
> new policy are better than the reasons for the old
> one; it suffices that the new policy is
> permissible under the statute, that there are good
> reasons for it, and that the agency believes it to
> be better, which the conscious change of course
> adequately indicates.  This means that the agency
> need not always provide a more detailed
> justification than what would suffice for a new
> policy created on a blank slate.  Sometimes it
> must — when, for example, its new policy rests
> upon factual findings that contradict those which
> underlay its prior policy; or when its prior
> policy has engendered serious reliance interests
> that must be taken into account.  Smiley v.
> Citibank (South Dakota), N.A., 517 U.S. 735, 742,
> 116 S. Ct. 1730, 135 L. Ed. 2d 25 (1996).  It
> would be arbitrary or capricious to ignore such
> matters.  In such cases it is not that further
> justification is demanded by the mere fact of
> policy change; but that a reasoned explanation is
> needed for disregarding facts and circumstances
> that underlay or were engendered by the prior
> policy.

F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 515-16

(2009) (emphasis in Fox).  Although not expressly stated in the

Quota Shifting Rule, Congress's enactment of Section 113 was a

significant occurrence that prompted NMFS to change its position

on the interpretation of "integral part" for purposes of catch

re-allocation.  Although the Quota Shifting Rule is not a model

of clarity regarding this policy change, that alone is not a

sufficient basis to invalidate the rule, as long as "the agency's

path may reasonably be discerned." See id. at 513-14 (citation and quotation marks omitted).  This Court concludes that it can be reasonably discerned from the Quota Shifting Rule that NMFS departed from its prior interpretation of "integral part" because of the enactment of Section 113.

Turning to Plaintiffs' argument that the interpretation of "integral part" in Section 113 and the Quota Shifting Rule is contrary to the relevant CMMs, this Court reiterates that neither CMM 2011-05 nor CMM 2013-05 sets forth a standard to determine whether vessel is "an integral part of the domestic fleet" of the chartering PT.  Moreover, pursuant to a September 25, 2015 order from this Court, [dkt. no. 64,] the Federal Defendants presented evidence that "for fishing years 2011, 2012, and 2013, the U.S. duly reported its attribution of catch under specified fishing agreements to the Territories."  [Federal Defs.' Additional Mem. in Opp. at 5.]

The Federal Defendants ask this Court to take judicial notice of the five exhibits to their Additional Memorandum in Opposition.  [Id. at 5 n.2.]  The documents are part of the Commission's records, and they are available on the Commission's website.  They are relevant to the issues before this Court because they address what the United States reported as its and the U.S. PTs' longline bigeye tuna catch during the relevant time period and the Commission's response thereto.  This Court need

not examine whether the statistics reported were accurate, which may subject reasonable dispute; it is concerned only with how the Commission responded to what was reported.  This Court therefore FINDS that the Federal Defendants' exhibits are subject to judicial notice pursuant to Fed. R. Evid. 201(b)(2), and GRANTS the Federal Defendants' request.

The United States's 2012 Annual Report to the Western and Central Pacific Fisheries Commission ("2012 Report") stated:

> In 2011 the Consolidated and Further Continuing Appropriations Act, 2012 (Pub. L. 112-55, 125 Stat. 552 et seq.) was passed, and if, after November 19, 2011, the U.S. vessel landing the fish was included in a valid arrangement under Sec. 113(a) of the [Consolidated and Further Continuing Appropriations Act ("CFCAA")], the fish was assigned to the fishery of American Samoa.

[Federal Defs.' Additional Mem. in Opp., Exh. 1 at 20.]  Table 1f of the 2012 Report set forth the breakdown of the annual longline catch of bigeye tuna in the North Pacific Ocean by the United States from 2007 through 2011, and by American Samoa from 2009 through 2011.[16]  The catch attributed to the United States in 2011 was 3,565 mt.  In light of the specified fishing arrangement - described in the 2012 Report as a Section 113(a) arrangement -

---

[16] Table 1f of the 2012 Report also includes American Samoa's longline bigeye tuna catch in the South Pacific Ocean, [Federal Defs.' Additional Mem. in Opp., Exh. 1 at 10,] but that data is not relevant to the issues before this Court in the instant Motion.

in 2011, the catch attributed to American Samoa was 965 mt, compared to 310 mt in 2010 and 89 mt in 2009. [Id. at 10.]

The United States's 2013 Annual Report to the Western and Central Pacific Fisheries Commission ("2013 Report") included the same language regarding Section 113(a) arrangements – i.e. specified fishing agreements – as the 2012 Report. [Federal Defs.' Additional Mem. in Opp., Exh. 2 at 19.] Table 1f of the 2013 Report also set forth the breakdown of bigeye tuna catch in the North Pacific by: the United States from 2008 through 2012; and American Samoa from 2009 through 2012.[17]   In 2012, the catch attributable to the United States was 3,654 mt, and the catch attributable to American Samoa was 1,338 mt. [Id. at 9.]

The United States's 2014 Annual Report to the Western and Central Pacific Fisheries Commission ("2014 Report") noted the passage of Section 113 in 2011 and stated:

> Pursuant to this act and NMFS regulations under 50 CFR 300.224, if the U.S. vessel landing the fish was included in a valid arrangement under Sec. 113(a) of the CFCAA, its catch during those periods was attributed to the fishery of American Samoa in 2011 and 2012, and CNMI in 2013.

[Federal Defs.' Additional Mem. in Opp., Exh. 3 at 17.]   Table 1f

---

[17] Although the statistics for the United States's bigeye tuna catch in Table 1f of the 2012 Report and in Table 1f of the 2013 Report were virtually identical, the statistics for American Samoa are different.  Table 1f of the 2013 Report states that the following amounts were attributed to American Samoa: 156 mt in 2009; 507 mt in 2010; and 1,086 mt in 2011.  Compare Federal Defs.' Additional Mem. in Opp., Exh. 1 at 10, with id., Exh. 2 at 9.

of the 2014 Report also set forth the breakdown of bigeye tuna catch in the North Pacific by: the United States from 2009 through 2013; American Samoa from 2009 through 2013; and CNMI in 2013.  In 2013, the catch attributable to the United States was 3,612 mt, the catch attributable to American Samoa was 276 mt, and the catch attributable to CNMI was 501.  [Id. at 8.]

The United States's 2015 Annual Report to the Western and Central Pacific Fisheries Commission ("2015 Report") included similar language regarding specified fishing agreements as the 2014 Report.  It stated that a portion of United States bigeye tuna catch was attributed to CNMI in 2014 pursuant to a specified fishing agreement.  [Federal Defs.' Additional Mem. in Opp., Exh. 4 at 18.]  Table 1f of the 2015 Report also set forth the breakdown of bigeye tuna catch in the North Pacific by: the United States from 2010 through 2014; American Samoa from 2010 through 2014; and CNMI in 2013 and 2014.  In 2014, the catch attributable to the United States was 3,815 mt, the catch attributable to American Samoa was 245 mt, and the catch attributable to CNMI was 1,000.  [Id. at 8.]

The Commission's Technical and Compliance Committee submitted a 2014 Final Compliance Monitoring Report (Covering 2013 Activities) ("TCC Report"), and it was adopted at the Commission's Eleventh Regular Session, September 23-29, 2015.  [Federal Defs.' Additional Mem. in Opp., Exh. 5.]  The TCC Report

found the United States to be compliant with paragraph 26 of CMM 2012-01,[18] which preceded CMM 2013-01.  [Id. at 30, 34.]

In light of the lack of standards for the "integral part" designation in the relevant CMMs, and the Commission's finding that – even with the use of specified fishing agreements – the United States was in compliance with the CMM 2012-01 catch limits, this Court CONCLUDES that the Quota Shifting Rule's interpretation of the relevant CMMs as allowing such agreements is reasonable.  Plaintiffs essentially disagree with the interpretation in the Quota Shifting Rule, but, even if this Court agreed with Plaintiffs' position, it cannot "substitute its judgment for that of the agency."  See Fox Television, 556 U.S. at 513 (citation and quotation marks omitted).  This Court therefore CONCLUDES that the Quota Shifting Rule's interpretation of CMM 2013-01 and CMM 2011-05 as allowing the re-allocation of United States bigeye tuna catch through specified fishing agreements with the U.S. PTs is not arbitrary and capricious, and does not exceed NMFS's authority.

   C.   **Effect of the Quota Shifting Rule**

Plaintiffs' next set of arguments address the effect of the Quota Shifting Rule.  Plaintiffs argue that, even if the U.S. PTs have separate catch limits and they have the ability to enter

---

[18] Paragraph 26 states: "The catch limits for bigeye tuna shall be as specified in Attachment F."  [Steen Decl., Exh. 11 (CMM 2012-01) at 8.]

into agreements to re-allocate part of their limits to the United States, this Court should still conclude that the Quota Shifting Rule is invalid because: 1) it makes the United States's catch limit illusory, and it is contrary to CMM 2013-01, which requires the reduction of bigeye tuna catch; 2) it will impermissibly increase the catch of non-target species; and 3) the specified fishing agreements do not actually further the development of the U.S. PTs' fisheries because what the U.S. PTs receive in the agreements is not commensurate with the benefits that Hawai`i-based vessels receive from the agreements.   The Court emphasizes that its consideration of these issues is limited to whether, in promulgating the Quota Shifting Rule, NMFS acted arbitrarily and capriciously or exceeded its authority.   The Court's function in this case is not to evaluate whether, in light of events that occurred after the promulgation of the rule, a different rule would have been more effective.

## 1.   **Effect on Bigeye Tuna Stock**

Plaintiffs argue that CMM 2013-01 requires the reduction in bigeye tuna catch, and the Quota Shifting Rule is invalid because it allows the United States to increase its catch, but that is over-simplifying the matter.   The relevant objectives of CMM 2013-01 are:

**General**

1.   Compatible measures for the high seas and exclusive economic zones (EEZs) are implemented so

> that bigeye . . . tuna stocks are, at a minimum, maintained at levels capable of producing their maximum sustainable yield as qualified by relevant environmental and economic factors including the special requirements of developing States in the Convention Area as expressed by Article 5 of the Convention. . . .
>
> . . . .
>
> **Bigeye**
>
> 3.   the fishing mortality rate for bigeye tuna will be reduced to a level no greater than Fmsy, i.e. F/Fmsy ≤ 1.  This objective shall be achieved through step by step approach through 2017 in accordance with this Measure.

[Steen Decl., Exh. 2 (CMM 2013-01) at 2-3, ¶ 1.]  The Quota Shifting Rule is not *per se* invalid because the rule makes it possible for the United States to catch more bigeye tuna. CMM 2013-01 aims to keep the bigeye tuna stock at a sustainable level and to reduce the mortality rate, but it recognizes that those concerns must be weighed against the relevant economic factors, such as the needs of developing states, like the U.S. PTs.  NMFS considered all of those factors in promulgating the Quota Shifting Rule, and there is no evidence that the agency relied upon facts that Congress did not intend it to consider. See Cascadia Wildlands v. Bureau of Indian Affairs, 801 F.3d 1105, 1110 (9th Cir. 2015) (stating that the Ninth Circuit will reverse an agency decision on the ground that it is arbitrary and capricious if, *inter alia*, "the agency relied on factors Congress did not intend it to consider").

64

For example, NMFS examined the status of the bigeye tuna stock in the Western and Central Pacific Ocean, and pointed out that the 2014 stock assessment concluded that the stock "is subject to overfishing, but not overfished or approaching an overfished condition." 79 Fed. Reg. at 64108. Further, bigeye tuna is not listed as "threatened or endangered under the Endangered Species Act." Id. It considered the Amendment 7 EA, see, e.g., 79 Fed. Reg. at 64099-101, which stated:

> [B]igeye tuna is a pan-Pacific stock that has recently been assessed separately in the WCPO and EPO for management purposes. The WCPO stock assessment is expansive, covering bigeye tuna from Indonesia in the far western Pacific, to the 150° W in the central Pacific Ocean. The WCPO stock assessment further separates fishing areas into six regions, and evaluates biomass and fishing mortality information and trends within the regions. The regions with the highest impact to bigeye tuna in the WCPO are Regions 3 and 4 – representing 88 percent of bigeye tuna fishing mortality. Regions 3 and 4 comprise the tropical equatorial zone between 20° N and 10° S, and whereby the area between 10° N and 10° S is distinguished as the core zone for the tropical tuna longline and purse seine fisheries. The majority of fishing effort by the Hawaii longline fishery occurs north of above 20° N in Region 2, and further 98 percent of bigeye tuna caught by the Hawaii longline fishery comes from north of 10° N and outside of the which [sic] is outside of the core equatorial zone of heavy purse seine and longline fishing.
>
> Fishing activity by Hawaii longline vessels conducted under Territory agreements pursuant to Section 113 would likely center around Hawaii, both within the EEZ and on the adjacent high seas in the North Pacific subtropical zone and outside of 10° N and 10° S equatorial belt. . . . [T]he estimated impact of bigeye tuna catches in

> Region 2 on the stock is much lower than Region 4 where the fishery and stock also occur.  According to the 2011 stock assessment for bigeye tuna in the WCPO, the trends in biomass in Region 2 are estimated to be more due to recruitment trends rather than fishing. . . .

[Steen Decl., Exh. 1 (Amendment 7 EA) at 125 (footnote and citations omitted).]  The Amendment 7 EA opined that the stock management approach under the proposed amendment

> is also consistent with the Magnuson-Stevens Act in managing the bigeye tuna throughout the range of the species, taking into account stock status, and U.S. and Territory longline catches of bigeye tuna which do not affect the stock status (i.e., whether it is in an overfishing condition or not) and comprise a small fraction of the total WCPO bigeye tuna catch.  Whereas the authority provided to the Territories in Section 113 allows for an unlimited amount of bigeye tuna to be assigned by the Territories under agreements with FEP-permitted vessels, this action would limit the amount available to be transferrable to 1,000 mt of bigeye tuna annually per Territory and thereby provide greater conservation and management of pelagic MUS.
>
> NMFS anticipates that the Pelagics FEP fisheries, including the Hawaii deep-set longline fishery, would continue to operate largely unchanged in terms of fishing location, the number of vessels that deep-set fish, the number of hooks deployed, catch rates of target, non-target, bycatch species, depth of hooks, or deployment techniques in setting longline gear, with respect to baseline operations.  This was observed in 2011 and 2012 when Territory agreements were authorized under the status quo (Section 113).

[Id. at 160.]

NMFS also addressed measures to ensure sustainability of the stock and to limit mortality.  The Quota Shifting Rule states:

> NMFS is taking this action to implement limits for longline-caught bigeye tuna for the territories to ensure sustainable management and to limit the overall mortality of bigeye tuna from fisheries of the United States and U.S. territories.  This action establishes accountability measures for attributing and restricting catch and fishing effort towards territorial limits, including catches and effort made under territory fishing agreements.  Annual review and action by the Council and NMFS will help ensure achievement of the WCPFC's conservation goals.  If, based on the conservation needs of the stock, NMFS disapproves the Council's annual recommendation, or if the Council recommends and NMFS approves an allocation limit of zero, then no territory fishing agreements would be accepted for the year covered by that action.

79 Fed. Reg. at 64102.  It also states:

> the Council will review existing and proposed catch or effort limits and the portion available for allocation at least annually to ensure consistency with WCPFC decisions, the FEP, the Magnuson-Stevens Act, and other applicable laws. Based on this review, at least annually, the Council will recommend to NMFS whether such catch or effort limit or the portion available for allocation should be approved for the next fishing year.  NMFS will review all Council recommendations and, if determined to be consistent with WCPFC decisions, the FEP, the Magnuson-Stevens Act, and other applicable laws, will approve the Council's recommendations.  If NMFS determines that a Council recommendation is inconsistent with WCPFC decisions, the FEP, the Magnuson-Stevens Act, or other applicable laws, NMFS will disapprove the recommendation.  If NMFS disapproves a catch or fishing effort limit specification or allocation limit, or if the Council recommends and NMFS approves no catch or

67

> fishing effort limit specification or allocation
> limit, then no specified fishing agreements would
> be authorized for the fishing year covered by such
> action.

Id. at 64098.  Further, "NMFS will monitor catches of

longline-caught bigeye tuna, including catches made under

specified fishing agreements, and restrict catches, as

appropriate, using the accountability measures described in this

final rule."  Id.  NMFS concluded that, with these accountability

measures in place, the process under the Quota Shifting Rule

"will help ensure sustainability of the stock" and "does not

impede the WCPFC objective of ending overfishing of bigeye tuna."

Id. at 64099.  NMFS anticipated that the United States would

catch no more than 1,000 mt per year pursuant to specified

fishing agreements and believed that it was unlikely that the

United States would catch the maximum 3,000 mt per year allowed

under the Quota Shifting Rule.  Id. at 64100.

Although NMFS anticipated that the use of specified

fishing agreements would result in re-allocated catch of no more

than 1,000 mt per year, NMFS has already utilized two specified

fishing agreements of up to 1,000 mt each for 2015.  See Pacific

Island Pelagic Fisheries; 2015 CNMI Longline Bigeye Tuna Fishery;

Closure, 80 Fed. Reg. 74002-01, 74003 (Nov. 27, 2015) (closing

"the U.S. pelagic longline fishery for bigeye tuna in the western

and central Pacific Ocean as a result of the fishery reaching the

2015 allocation limit of 1,000 mt for the CNMI"); Pacific Island

Pelagic Fisheries; 2015 U.S. Territorial Longline Bigeye Tuna Catch Limits for Guam, 80 Fed. Reg. 75437-01 (Dec. 2, 2015) (announcing a valid specified fishing agreement). However, that fact alone does not support Plaintiffs' position that the Quota Shifting Rule is invalid. There has been no evidence in this case that, in promulgating the Quota Shifting Rule, NMFS either failed to consider that the re-allocated catch may exceed 1,000 mt or offered an estimated re-allocation level that was contrary to the evidence before it. See Cascadia Wildlands, 2015 WL 5306321, at *3 (stating that the Ninth Circuit will reverse an agency decision on the ground that it is arbitrary and capricious if the agency, inter alia, "entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise").

Moreover, the Quota Shifting Rule clearly allows up to three specified fishing agreements of up to 1,000 mt each, and NMFS has mechanisms in place to evaluate the conditions of the bigeye tuna stock to determine the appropriate re-allocation level.

> The EA analyzed the impacts of the specified territory catch limits for bigeye tuna, not only in 2014 when the limits are in effect, but also through 2017 and 2020 when based on existing management measures and the best scientific information available, overfishing of bigeye tuna

69

is expected to end.  In addition, the EA analyzed
various catch levels of bigeye tuna under
agreements, including the most likely scenario
that the territories would assign 1,000 mt to U.S.
vessels, based on the latest stock assessment of
bigeye tuna in the WCPO (2011), along with other
stock assessments and information for non-target
and protected marine species.

The stock status trend in the Tuna Management
Simulator (TUMAS) model (developed by the
Secretariat of the Pacific Community, the science
provider to the WCPFC) using recent average
recruitment of WCPO bigeye tuna, suggests further
improvements in stock conditions by 2017 and 2020.
The 2014 allocation allows each territory to
transfer no more than 1,000 mt.  **In the future, if
the best scientific information available and
environmental analyses indicate that stock
conditions have not improved as projected, the
Council and NMFS would likely approve a smaller
transferable allocation, or none at all.**  Further,
the annual review process allows the Council and
NMFS to take corrective action, as appropriate, to
meet the conservation needs of the stock,
non-target stock, or protected species.

79 Fed. Reg. at 64102 (emphasis added).  Similarly, if NMFS would

limit the re-allocation of bigeye tuna to less than 1,000 mt a

year, when necessary based on the status of the stock, it follows

that NMFS would only authorize the re-allocation of more than

1,000 mt a year - up to 3,000 mt - if the status of the stock

could support that re-allocation level.

Ultimately, the Quota Shifting Rule states that "NMFS

is satisfied that safeguards, including the availability of

annual review and prompt corrective action, are sufficient to

respond to any change in the conservation needs of the stock and

70

to keep impacts of this action to a minimum."  79 Fed. Reg. at
64102.  Thus, although the Quota Shifting Rule allows the United
States to increase its catch of bigeye tuna, in promulgating the
rule, NMFS considered the relevant factors, the available
evidence, and concluded that the rule would further the
development of the U.S. PTs' domestic fisheries and would not
impair the objectives of maintaining the sustainability of the
bigeye tuna stock and decreasing morbidity.  Such findings
require "a high level of technical expertise," and therefore this
Court's deference to NMFS's findings is "at its highest."  See
San Luis & Delta-Mendota Water Auth. v. Locke, 776 F.3d 971, 994
(9th Cir. 2014).  Plaintiffs have not presented any ground for
this Court to disregard the high level of deference.  They have
not presented evidence that NMFS relied on improper factors,
failed to consider important aspects of the problem, or offered
unsupported or implausible explanations for its findings.  This
Court therefore rejects Plaintiffs' argument that the Quota
Shifting Rule is arbitrary or capricious and/or exceeds NMFS's
authority because NMFS failed to adequately consider the effect
of the rule on the bigeye tuna stock.

### 2.  Effect on Non-target Species

Plaintiffs also argue that "[t]he Quota Shifting Rule
will result in increased bycatch of yellowfin and northern
albacore tuna, sea turtles, seabirds, and silky and oceanic

71

whitetip sharks, undermining the effectiveness of conservation and management measures adopted pursuant to the Convention to protect these species." [Amended Complaint at ¶ 4.] Further, they allege that it will "increase bycatch of species protected under the Endangered Species Act, 16 U.S.C. §§ 1531 *et seq.*, including, but not limited to, critically endangered Main Hawaiian Islands insular false killer whales and leatherback and loggerhead sea turtles." [Id.]

The Amendment 7 EA recognized that "catches of non-target species in the Hawaii longline fishery are driven by the fishing effort for bigeye tuna. If fishing effort for bigeye tuna increases, the catches of other target and non-target stocks would be expected to increase commensurate with the increases in fishing effort." [Steen Decl., Exh. 1 at 137.] The Quota Shifting Rule incorporates this principle. 79 Fed. Reg. at 64099 ("Catches of non-target species under this rule are commensurate with the level of fishing effort for bigeye tuna."). However, as with the effect on the bigeye tuna stock, the Quota Shifting Rule is not *per se* invalid because it would result in the increased catch of non-target species.

The Amendment 7 EA stated:

The likely scenario under Alternative 4 and Sub-Alternative 4(b) is expected to result in Hawaii longline fishing effort and catch levels similar to those observed in 2011 and 2012. Catches of non-target species under this Alternative are

72

anticipated to be within baseline levels described under Alternative 1 and would be sustainable.[19]

[Steen Decl., Exh. 1 at 137.]  In addition to noting the impacts reflected in the Amendment 7 EA, the Quota Shifting Rule states:

> Moreover, in a Biological Opinion dated September 19, 2014, NMFS concluded that the continued operation of the Hawaii deep-set longline fishery under effort levels expected under the proposed action is not likely to jeopardize the continued existence of ESA-listed humpback whales, sperm whales, the MHI insular false killer whale distinct population segment (DPS), North Pacific loggerhead DPS, leatherback sea turtles, olive ridley sea turtles, green sea turtles, and the Indo-west Pacific scalloped hammerhead DPS.  NMFS based this conclusion on a careful assessment of the effects of the action, together with the environmental baseline and the cumulative effects.
>
>      . . . With respect to Western and Central North Pacific (WCNP) striped marlin, NMFS does not anticipate this action to result in catches that exceed the U.S. limit for WCPO striped marlin under CMM 2010-01.  Each cooperating member, non-member, and participating territory of the WCPFC is subject to a 20-percent reduction of the highest catch of North Pacific striped marlin between 2000 and 2003.  The measure provides that each flag/chartering member, cooperating non-member, and participating territory (CCM) shall decide on the management measures required to ensure that its flagged/chartered vessels

---

[19] Alternative 1 was titled "No action/Status quo - Manage Territory Limits Consistent with Existing Provisions of Section 113." [Steen Decl., Exh. 1 (Amendment 7 EA) at 37.]  In other words, "the Territories could harvest the amount of pelagic [management unit species] that is agreed to by the WCPFC.  At present, under the existing regulatory regime and Section 113, the Territories can harvest an unlimited amount of bigeye tuna and transfer an unlimited amount to eligible U.S. vessels . . . ." [Id.]  Alternative 4, together with Sub-Alternative 4(b), describe the management framework ultimately adopted in the Quota Shifting Rule.  [Id. at 40-44.]

operate under the specified catch limits.
CMM 2010-01 provides exemptions to catch limits
for the SIDS and PTs.  The WCPO striped marlin
limit applicable to the U.S. (i.e., Hawaii)
fisheries in 2013 and beyond is 457 mt annually,
which accounts for the 20 percent reduction agreed
to in CMM 2010-01.  U.S. catch has been below
levels agreed to by the WCPFC.  Table 12 in
Amendment 7 describes recent catches of North
Pacific striped marlin by U.S. longline vessels,
including catches attributed under fishing
agreements.  Historical average landings from
2008-2012 are only 60 percent of the U.S. limit
under CMM 2010-01 for 2013 and beyond.  Although a
non-target species caught while targeting bigeye
tuna and swordfish, striped marlin are highly
marketable and longline fishermen typically
discard less than five percent.

NMFS has no information that impacts on
sharks will increase under the proposed action.
With the exception of mako and thresher sharks
that are sometimes retained for market in low
quantities, U.S. longline fishermen based in the
Pacific Islands release most sharks alive.

. . . NMFS expects fishing effort, expected
catch rates, and total catches for target and
non-target species to remain within the range
observed in 2011, 2012, and 2013 under Section
113.

79 Fed. Reg. at 64099.

Although the actual re-allocated catch of bigeye tuna

pursuant to specified fishing agreements – and therefore also the

catch of non-target species – has exceeded the estimated amount,

NMFS did consider the possible catch of up to 3,000 mt of bigeye

tuna per year pursuant to such agreements – and the commensurate

catch of non-target species.  In addition, as with the bigeye

tuna stock, the Quota Shifting Rule states that "the annual

74

review process allows the Council and NMFS to take corrective action, as appropriate, to meet the conservation needs of the stock, **non-target stock, or protected species**." 79 Fed. Reg. at 64102 (emphasis added). NMFS would not allow the re-allocation of more than 1,000 mt of bigeye tuna if it resulted in impermissible catch levels of non-target species.

Like NMFS's findings regarding the effect of the rule on the bigeye tuna stock, its findings regarding the effect on non-target species are entitled to the highest deference because they require a high level of technical expertise. Plaintiffs have not presented any ground for this Court to disregard the high level of deference. They have not presented evidence that NMFS relied on improper factors, failed to consider important aspects of the problem, or offered unsupported or implausible explanations for its findings. This Court therefore rejects Plaintiffs' argument that the Quota Shifting Rule is arbitrary or capricious and/or exceeds NMFS's authority because NMFS failed to adequately consider the effect of the rule on non-target species.

### 3.  Effect on the U.S. PTs

Plaintiffs have also criticized the Quota Shifting Rule on the ground that the benefits that the U.S. PTs receive in exchange for entering into the specified fishing agreements is not commensurate with the benefits that Hawai`i-based longline fishing industry receives. Plaintiffs submitted excerpts of an

75

agreement dated October 14, 2013 between the CNMI and a Hawai`i corporation, acting on its own behalf and on behalf of certain Hawai`i-based vessels. [Henkin Reply Decl., Exh. 44.] At the hearing on the Motion, Plaintiffs pointed out that, in 2014, the CNMI received $175,000 in exchange for allocating 1,000 mt of its bigeye tuna catch limit, and Plaintiffs emphasized that this amounts to only $0.08 per pound.

Plaintiffs have primarily raised this argument in connection with their position that a Hawai`i-based vessel operating under such an agreement is not an integral part of the U.S. PT's domestic fleet. However, to the extent that Plaintiffs allege that the inadequacy of the agreements is one of the grounds that warrant invalidating the Quota Shifting Rule, this Court rejects Plaintiffs' argument. First, such a claim is not properly before this Court because Plaintiffs did not include it within their Amended Complaint. Second, even assuming, *arguendo*, that the claim was properly before this Court, it would fail on the merits.

In promulgating the Quota Shifting Rule, NMFS considered the importance of specified fishing agreements to the U.S. PTs' domestic fisheries:

> Absent Territorial agreements, the mechanism that agreements offer for the infusion of capital in support of responsible fisheries development would be eliminated, resulting in a lower potential for Territorial diversification (e.g., American Samoa) and capacity-building (Guam and CNMI), which would

76

> enable the U.S. Territories to participate in the
> world's largest tuna fishery.  For example, under
> the 2011 and 2012 ASG/HLA agreement, funds were
> transmitted to NMFS to deposit into the
> Sustainable Fisheries Fund to support fisheries
> development projects identified in the American
> Samoa MCP.

[Steen Decl., Exh. 1 (Amendment 7 EA) at 129.]  The importance of

these benefits to the U.S. PTs are reflected in the Quota

Shifting Rule.  See, e.g., 79 Fed. Reg. at 64098 (noting that the

rule "requires that any fishing agreements between the U.S.

participating territories and U.S. vessels include support for

fisheries development projects in the territories and as

described in their marine conservation plans"); id. at 64109

("specified fishing agreements must either provide for landing or

offloading of catch in the ports of the relevant territory or

provide funds to the Western Pacific Sustainable Fisheries Fund

to support fisheries development in that territory").  Further,

as previously noted, the Quota Shifting Rule establishes criteria

that a specified fishing agreement must meet to be approved, as

well as accountability measures to monitor agreements in force.

Establishing an effective mechanism to ensure the

adequacy of the consideration exchanged between a Hawai`i-based

vessel and a U.S. PT in a specified fishing agreement is an

agency action that requires a high level of technical expertise.

Thus, this Court accords the highest deference to NMFS's adoption

of accountability measures to ensure that specific agreements are

appropriate.   Plaintiffs have not presented any evidence that would overcome such deference.

The Court has rejected all of Plaintiffs' allegations that NMFS failed to properly consider the effects of the Quota Shifting Rule.   Having considered all of Plaintiffs' arguments regarding the validity of the Quota Shifting Rule,[20] the Court cannot conclude that the rule is arbitrary and capricious, nor can the Court conclude that the rule exceeds NMFS's authority. In light of this Court's ruling, it does not need to address Plaintiffs' arguments regarding remedy.

## CONCLUSION

On the basis of the foregoing, Plaintiffs' Motion for Summary Judgment and for Vacatur, filed July 20, 2015, is HEREBY GRANTED IN PART AND DENIED IN PART.   This Court GRANTS the Motion as to the preliminary issues of standing and justiciability, but DENIES the Motion on the merits of Plaintiffs' claims.

//

//

//

//

//

---

[20] Any specific argument by Plaintiffs that this Court did not expressly address in this Order is hereby deemed rejected on the merits.   This Court has not deemed any argument waived for failure to raise it during the administrative proceedings.

IT IS SO ORDERED.

DATED AT HONOLULU, HAWAII, December 23, 2015.



    /s/ Leslie E. Kobayashi
Leslie E. Kobayashi
United States District Judge

__CONSERVATION COUNCIL FOR HAWAII, ET AL. VS. NATIONAL MARINE FISHERIES SERVICE, ET AL.__; CV 14-00528 LEK-RLP; ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND FOR VACATUR